**KRAUS, Plaintiff, v. CLEVELAND (City) et, Defendants.**

Common Pleas Court, Cuyahoga County.

No. 638321.   Filed October 23, 1953.

418

420

Joseph H. Crowley, Director of Law, Charles W. White, Burt J. Fulton, Asst. Directors of Law, Cleveland, for defendants.

William J. Kraus, Cleveland, for plaintiff.

## OPINION

By ARTL, J.

The City of Cleveland, a municipal corporation, as one of its proprietary functions, operates a municipal water department through the Department of Public Utilities known as the Division of Water and Heat which furnishes water to approximately 1,200,000 residents of Cuyahoga County, of which approximately 800,000 are residents of the City of Cleveland, through a system of underground mains and pipes, maintained by the City, and the City enjoys a monopoly of the water system therein.

The City through the passage of various resolutions, ordinances and actions of the Board of Control is preparing to or did procure facilities and products for, and has determined to treat all of the water supply of so-called city water with fluorides.

The plaintiff prays a temporary restraining order be issued forthwith restraining the defendant and each of them from expending any money directly or indirectly, for the fluoridation of city water or for any other purpose; that said defendants be restrained from advertising for bids or entering into and signing any contracts pursuant to said Ordinances and Resolutions; that said Ordinances and Resolutions be declared null, void, of no force and effect, and unconstitutional; that all contracts entered into by the defendant, City of Cleveland, pursuant to the authority contained in said Ordinances and Resolutions be declared void, illegal and of no force and effect; that upon final hearing, the above orders be made perpetual; and for such other and further relief as the Court may find the plaintiff entitled to in law or equity.

### THE PLEADINGS.
#### Plaintiff's Petition.

The plaintiff brings his action as a taxpayer and the allegations of his petition bring him properly before the court as such. Among the averments of the petition are the existence of the first and fourth Amendments to the Constitution of the United States; the provisions of **Article I Sections 1 and 7 and Article XVIII Section 3 of the Constitution of the State of Ohio;** the provisions of §§1252-1, 1261-16, 4404, 4413, 3616, 3619, 3646, 1286, 12694, 12706, 1296-1, 1329, 1329-1, and 12714 GC; Sec. 673 of the Municipal Code of the City of Cleveland; and Sec. 1 of the Charter of the City of Cleveland.

There follows a recitation of and the effective dates of

the various resolutions and ordinances adopted by the City Council and Board of Control of said City preparatory to putting into effect its plan of fluoridation.

There follows an allegation that the Board of Control and the Director of Public Utilities will act pursuant to such legislation unless restrained by the Court with resultant substantial financial loss to the municipality.

The purpose of the legislation is fully described by plaintiff, and most of such averments are incorporated into the Agreed Statement of Facts hereinafter set forth.

The petition contains a lengthy statement of the basis for the claim by plaintiff of the invalidity of the fluoridation program. These will be discussed in the groups and in the order presented in plaintiff's trial brief.

Plaintiff concludes with the allegation that the officers involved will unless restrained complete the program, expend substantial sums of money; that no other source of water is reasonably and economically available to him and the taxpayers of the City of Cleveland, and that he will suffer irreparable injury for which he has no adequate remedy at law.

### DEFENDANTS' JOINT ANSWER.

The answer of the defendants contains three defenses separately stated and numbered.

**First Defense:** That the statements and allegations contained in plaintiff's petition are insufficient to constitute a cause of action against the defendants or any of them.

**Second Defense:** A general denial, following allegations containing admissions of many of the averments of plaintiff's petition, including an allegation admitting that the defendant Crown, Director of Public Utilities, will unless restrained proceed with his task of complying with the legislation adopted.

**Third Defense:** Following a recitation of the pertinent provisions of the City Charter authorizing the action of the defendants, specifically Sec. 1-2-24-67-77-78-79-80-82-99-100-108-111-143-167, and the various actions by the City Council of defendant City of Cleveland relating to the subject matter of plaintiff's petition, the defendants further answering say as their third defense that the determination of the feasibility and practicability of treating city water with fluorides has been made by proper legislative and executive authorities of the municipality after due and extensive inquiry and consideration including numerous and extended public hearings where facts and arguments pro and con were submitted and given consideration. Said determination was in all respects made in the manner prescribed by the aforementioned provisions of the municipal charter.

The defendants pray that an injunction be denied; that

the petition be dismissed and that they be allowed to go hence with their costs.

## PLAINTIFF'S REPLY.

Plaintiff for his reply, following admissions of several of the allegations contained in defendants' joint answer, denies each and every, all and singular, the allegations and averments in defendants' joint answer contained not specifically admitted to be true, except those which admit the allegations of plaintiff's petition.

## FACTS AGREED UPON BY THE PARTIES.

"It is agreed by and between the parties to this cause that the facts hereinafter stated are true and may be so considered by the Court in the within action, subject only to a reservation by each of the parties to object to the relevancy of any particular fact or facts.

1. Plaintiff is a taxpayer of the City of Cleveland. He brings this action in that capacity. He had previously demanded in writing that the Director of Law bring such action but had been met with refusal.

2. Defendant City is a municipal corporation organized and existing under the Constitution and Laws of the State of Ohio and a Charter duly adopted by its electors. Defendant Crown is the Director of the municipal Department of Public Utilities, one division of which is that of water and heat. Defendant Levy is the Treasurer of the municipality.

3. The Charter of Cleveland contains the following provisions among others: Sec. 1-2-24-67-77-78-79-80-82-87-90-99-100-108-111-143-167.

4. Defendant City owns and operates a waterworks under the style and title of Division of Water and Heat. The division is the only supplier of potable water within the limits of defendant city. The division supplies water to approximately 1,200,000 residents of Cuyahoga County, about 800,000 of whom are residents of the City of Cleveland. The supply is afforded by a system of underground mains and pipes maintained by defendant city, except that while it sells water through master meters to the suburbs of Lakewood, East Cleveland, Cleveland Heights and Bedford, it maintains no pipes or mains therein. Defendant city furnishes water not only for drinking purposes but also for industrial use and for sanitary purposes.

Section 3.3524 of the Codified Ordinances of the City of Cleveland (formerly Section 673 of the Municipal Code of the City of Cleveland of 1924) as amended provides as follows:

"Adulteration of Non-Alcoholic Drinks. No person, firm or corporation shall prepare, manufacture, sell, keep for sale,

deliver or suffer or permit to be prepared, manufactured, sold, kept for sale or delivered any non-alcoholic drink, which contains any boric acid or borates, salicylic acid or salicylates, formaldehyde, sulphurous acid or sulphites, hydrofluoric acid or benzoates, fluoborates, fluosilicates or other fluorine compounds, * * * or any other substances deleterious to health."

On October 23, 1950, the Council of defendant city adopted Resolution No. 1869-50, in terms as follows:

"Be it resolved by the Council of the City of Cleveland:

"Section 1. That the Director of Public Utilities and the Director of Public Health and Welfare be and they hereby are requested to investigate and report upon the feasibility and practicability of treating city water with fluorides."

Thereafter a report favorable to treating city water with fluorides was duly made. On March 12, 1951, Council adopted Resolution No. 270-51 in terms as follows:

"Be it resolved by the Council of the City of Cleveland:

"Section 1. That the Director of Public Utilities be requested to take the steps necessary to begin the treatment of city water with fluorides."

On May 14, 1951, it passed Ordinance No. 996-51 in terms as follows:

"Be it ordained by the Council of the City of Cleveland:

"Section 1. That pursuant to Section 167 of the Charter of the City of Cleveland it is hereby determined to make the public improvement of furnishing and installing fluoridation equipment at Division, Baldwin and Nottingham filter plants, Division of Water and Heat, Department of Public Utilities, by contract duly let to the lowest responsible bidder after competitive bidding upon a unit basis for the improvement.

"Section 2. That the Director of Public Utilities be and he hereby is authorized and directed to enter into a contract for the making of the above public improvement, said contract to be entered into with the lowest responsible bidder after competitive bidding upon a unit basis for the improvement."

On December 10, 1951, it passed Ordinance No. 2061-51 in terms as follows:

"Be it ordained by the Council of the City of Cleveland:

"Section 1. That existing Ord. No. 996-51, passed May 14, 1951, be and the same is hereby repealed.

"Section 2. That pursuant to Section 167 of the Charter of the City of Cleveland it is hereby determined to make the public improvement of furnishing and installing fluoridation equipment at Division, Baldwin and Nottingham filter plants, Department of Public Utilities, by contract duly let to the

lowest responsible bidder after competitive bidding for a gross price, provided that separate contracts may be made with the lowest responsible bidder for each or any combination of the component parts of said improvement.

"Section 3. That the Director of Public Utilities be and he hereby is authorized and directed to enter into a contract or contracts for the making of the above public improvement with the lowest responsible bidder after competitive bidding for a gross price. Said contract or each of them shall contain a provision that the contractor upon request of said director shall furnish a correct schedule of unit prices, including profit and overhead upon all items constituting said improvement.

"Section 4. That the cost of said improvement hereby authorized shall be paid from Fund No. 201 (Ord. No. 1642-49); Request No. 226-51."

On April 28, 1952, it passed Ordinance No. 585-52 in terms as follows:

"Be it ordained by the Council of the City of Cleveland:

"Section 1. That the Director of Public Utilities be and he hereby is authorized and directed to make a written contract in accordance with the Charter and Municipal Code for each or all of the following items:

Not to exceed 700 tons of fluoride chemicals, to be purchased by the Commissioner of Purchases and Supplies upon a unit basis for the Division of Water and Heat, Department of Public Utilities."

"Section 2. That the cost of said contract hereby authorized shall be paid from Fund 101-B-9; Request No. 119-52."

Pursuant thereto bids were advertised for, received and tabulated in the manner provided by law.

On May 28, 1952, the Board of Control of defendant city adopted resolutions Nos. 326-52 and 327-52, in terms as follows:

"Resolved, by the Board of Control of the City of Cleveland that the bid of The Sweeny and Wise Company for the following:

Furnishing and installing Fluoridation equipment, Item 1, for the Division of Water and Heat, Department of Public Utilities, which on the basis of estimated quantities would amount to forty thousand, seven hundred ninety-two and no/100 ($40,792.00) dollars, received on the 28th day of March, 1952, is hereby affirmed and approved as the lowest responsible bid, and the Director of Public Utilities is hereby requested to enter into contract for such commodities."

"Resolved by the Board of Control of the City of Cleveland that the bid of The John N. Murnane Company for the following:

Furnishing and installing fluoridation equipment, Items 2 and 3, for the Division of Water and Heat, Department of Public Utilities, which on the basis of estimated quantities would amount to seventy-five thousand, two hundred ninety and no/100 ($75,290.00) dollars, received on the 28th day of March, 1952, is hereby affirmed and approved as the lowest responsible bid, and the Director of Public Utilities is hereby requested to enter into contract for such commodities."

5. Contracts were prepared accordingly but due to the pendency of this action have not been executed by defendant Crown on behalf of defendant city pursuant to the aforesaid approvals of awards.

6. The Director of Public Utilities will, pursuant to said resolutions and ordinances passed by Council of the City of Cleveland, and a resolution of approval by the Board of Control, enter into a contract in the amount of $40,792.00 with Sweeny & Wise Company, or other contractor, for furnishing and installing fluoridation equipment, unless restrained from so doing by the Court in this action.

7. The Director of Public Utilities, will, pursuant to resolutions and ordinances passed by the Council of the City of Cleveland, and a resolution of approval by the Board of Control, enter into a contract in the amount of $75,290.00 with The John J. Murnane Company, or other contractor, for furnishing and installing additional fluoridation equipment, unless restrained from so doing by the Court in this action.

8. So long as the City of Cleveland adheres to a program of fluoridation of water, the annual cost for fluoride salts necessary thereto will approximate $100,000.00. The City of Cleveland will be required to employ three additional permanent supervisory personnel to operate and maintain the fluoridation equipment and accomplish the technique of fluoridation at an annual cost of approximately $10,000.00. And the City of Cleveland will be required to expend approximately $5,000.00 per year for the maintenance of said fluoridation equipment.

9. The ordinances and resolutions passed by the Council of the City of Cleveland in connection with fluoridation, being Resolutions Nos. 270-51, 1869-51, 326-52, and 327-52, and Ordinances Nos. 2601-51, 585-52 and 996-51 have, for their sole object, the introduction of inorganic fluoride chemicals into the drinking water of the City of Cleveland, for the primary purpose of prevention of dental caries in children from age 6 to 12, and to give resistance to tooth decay to said children as a preventive therapeutic agent.

10. The inorganic fluoride chemicals to be introduced into

the water of the City of Cleveland will not, and are not intended to have any effect primarily on the teeth of children under the age of six, or above the age of twelve, or upon adults.

11. The said inorganic fluoride chemicals to be introduced into the drinking water of the City of Cleveland will not, and are not intended to have any effect on the potability, palatability or purity of the drinking water of the City of Cleveland.

12. The inorganic fluoride chemicals to be introduced into the drinking water of the City of Cleveland will not, and are not intended, to treat any disease which is contagious, malignant or infectious.

13. The said inorganic fluoride chemicals to be introduced into the drinking water of the City of Cleveland are colorless, odorless and tasteless.

14. The ordinances and resolutions passed by the Council of the City of Cleveland, providing for the introduction of fluorides into the water system of the City of Cleveland, provide for the introduction of fluorides into the entire water supply system, and all the water supplied thereby, sixty-five to seventy per cent of said water is used industrially, and ten per cent of the population, namely the age group six to twelve years, are intended to receive the primary benefits therefrom.

15. The City of Cleveland, through its Department of Public Utilities, Division of Water and Heat, sells water to suburban communities in Cuyahoga County, whose residents, comprising approximately 400,000 consumers, obtain drinking water through contracts entered into between the City of Cleveland and suburban governments, which contracts call for the furnishing of pure, potable and palatable water delivered to the mains of said suburban governments.

16. Certain of the taxpayers and consumers of water of the City of Cleveland practice religious beliefs which discourage the taking of medication in any form, although no such groups appeared at any public hearing on the subject of fluoridation and did not object orally or otherwise.

17. The City of Cleveland is the only public agency which owns and maintains a water supply system in the City of Cleveland and Cuyahoga County, Ohio.

18. There is a difference of opinion in the United States as to the value of fluoridation in preventing and reducing dental caries in children and its effect on the health and well-being of the adult population; the introduction of inorganic fluoride chemicals to Cleveland city drinking water is a local experiment which it is anticipated will produce the result of lessened dental caries in children without any ill effects to the health of the people generally.

19. Water is necessary to human life.

20. It is recognized that fluorine, fluorides and other fluorine compounds are chemicals.

21. It is recognized that fluorine is a very toxic substance and its introduction into the Cleveland city drinking water must be accomplished by trained experts to prevent harm to the users thereof. Fluorides are colorless, ordorless and tasteless. Ordinarily, the user would have no way of detecting toxic quantities in his drinking water.

22. That the Director of Public Utilities of the City of Cleveland and the Director of Public Health and Welfare of the City of Cleveland have investigated only the feasibility and practicability of treating the water supply system of the City of Cleveland with fluorides so far as the mechanical aspects of fluoridation are concerned. They made no investigation as to its ability to prevent dental caries in children or its effects on the health of adults.

23. Fluorides may be directly applied to the teeth of children six to twelve years of age for the same purpose as is accomplished by fluoridation of public drinking water, and this method is called the topic application of fluoride and is performed by a dentist.

24. Unless they are restrained by order of court or unless the afore-mentioned legislation should be seasonably repealed, defendant city and its officers will do all things necessary to execute the legislative mandate described in the afore-mentioned resolutions and ordinances of council."

### SCOPE OF TRIAL.

In addition to the agreed statement of facts hereinabove set forth, the trial of this cause consumed several days, in the taking of testimony, each side having submitted a wealth of exhibits and substantial and able briefs covering the various issues raised by the pleadings.

The evidence offered dealt primarily with the value and safety of the artificially fluoridated water program; the legislative procedure of the Cleveland City Council and the engineering aspects of the program to add sodium fluoride to the water supply of this community.

### RULING ON QUESTION OF ADMISSIBILITY OF EVIDENCE OFFERED BY PLAINTIFF RESERVED DURING TRIAL.

The plaintiff to support his position offered Plaintiff's Exhibit 6, being a printed transcript of Hearings Before The House Select Committee to Investigate the Use of Chemicals in Foods and Cosmetics House of Representatives Eighty Second Congress Second Section Pursuant to House Resolution 74 and House Resolution 447, frequently referred to as

the "Delaney Committee." The hearings devoted much time and the transcript contains substantially 275 pages of sworn testimony of various witnesses who testified both for and against the proposed plan of artificially fluoridating communal waters, some of the same witnesses appearing personally on the trial of this cause.

Plaintiff's Exhibit 5 offered by plaintiff was the official report of the committee conducting the hearings made to the House of Representatives.

The Court reserved his ruling upon the admissibility of these exhibits (Plaintiff's 5 and 6) to give counsel time to brief the subject of their admissibility. The Court has reviewed this matter upon the briefs submitted and concludes that since they are the product of an official body, legally authorized, all of the testimony taken being that of witnesses properly qualified and given under oath, such testimony so obtained should certainly be given as much credence as many of the exhibits offered by both sides consisting of literature upon the subject under consideration depending for its authenticity upon its publication in official organs of various scientific societies or associations. It is evident that the witnesses both for and against the proposal were submitted to vigorous cross examination both by counsel for the committee as well as official members of the committee, some of whom by reason of professional status, being peculiarly competent to carry on such cross examination. The record will therefore show that the Court has admitted these exhibits as a part of the plaintiff's case.

### REVIEW OF THE EVIDENCE AS TO THE EFFICACY AND SAFETY OF THE FLOURIDATION PROGRAM.

The Court has carefully reviewed all of the evidence received on the trial of this case. It is not the intention or purpose to review herein all of such evidence but rather to point up the high-lights pertinent to this discussion.

It is generally conceded that the proposal to artificially fluoridate public drinking waters is a highly controversial subject. The positive accomplishments of the program are quite generally recognized. It is because of the many important questions still unanswered by science that skepticism exists. Some of those who suggest and counsel delay quite readily admit they are in the minority.

Historically, the discoveries that a very ugly disfiguring dental defect known as mottled enamel prevalent in certain parts of the country was due to the presence of fluorine in public drinking waters and that the ingestion of fluorine has an inhibiting effect upon the incidence of dental caries opened

the door to scientific investigation, the result of which ultimately laid the basis for the program of artificially fluoridating public drinking waters.

Tooth decay has long been thought of as an unsolved dental disease almost universal in its occurrence (Dr. Margaret Smith); and is recognized as such by the United States Public Health Service.

Aside from the incidence of caries generally throughout the United States, we are here concerned with the conditions existing in this state and community. In the opinion of the local Commissioner of Health dental caries in Cleveland is one of our outstanding health conditions. (Dr. Knapp, p. 469 Trans.)

The Division of Dental Hygiene of the Ohio Department of Health, over a considerable number of years has been occupied in the examination of the dental condition of school children in Ohio. They have issued reports on the prevalence of carious conditions in the school children. As a result of many field studies made by the Department of Health, the general indications over the years are that about 85% of the school children have carious conditions of the teeth. The degree of severity of this carious condition is on the order of six carious or missing teeth per child. To the Director of Health of the State of Ohio, this condition suggests the presence of a public health problem. It is one of the most distressing problems the Department has, not from the point of view of death, but of morbidity. (Dr. Porterfield, pp. 524-525 Tr.)

On a national scale, the United States Public Health Service began an extensive search for data that would lead to the possible discovery of a basis at which it would be safe for the ingestion of fluorides to avoid dental fluorosis, mottled enamel, without losing the benefit of fluorides' effect upon dental caries.

The study progressed to such a degree that "it led to the establishment in 1942 of one part per million and in 1946 of 1.5 parts per million as the maximum fluorine concentration acceptable under the requirements of the Public Health Service drinking water standards. So, the level of 1.5 parts per million was actually set as a safe level for water standards years before the recommendation was made that fluorides be added in optimum amounts to prevent tooth decay." (Dr. Forsythe—Delaney Report—page 1484.)

Public Health Authorities continued to study the problem, notably the New York State Health Department and the United States Public Health Service, extending their studies to several

controlled or pilot studies involving the addition of fluorides to non-fluoride waters in one community and comparing by various investigations the results with a nearby community whose water is fluoride free. The most notable of such experimental communities are Grand Rapids, Mich., Newburgh, N. Y., Kingston, N. Y., Bradford, Ont., Lewiston, Idaho, Evanston, Ill., Madison, Wisc., Marshall, Texas, Sheboygan, Wisc.

The experimental programs set up were originally designed to run from 10 to 15 years, primarily to enable the authorities to study the effect of artifically added fluorine ingested by children during the entire period from the earliest formative age of a child to the time that his dentures become permanent. Interim reports have been forthcoming at regular intervals with varying results. The fact is that invariably the results of those studies and reports substantiated the conclusion that dental caries are greatly reduced where artificially added fluoride waters are being consumed by children as compared, under the specific procedures set up for these experiments, with communities whose waters are fluoride free. None of these original experiments have been concluded, that is, they have not run the entire length of time originally contemplated.

The known results or accomplishments of these experiments with respect to the effect of fluorine upon dental caries leave very little doubt, if any, that the program is not only successful but a very valuable weapon with which to attack this prevalent disease.

Particular note should be made of the fact that many communities in the United States, and throughout the world have for their use drinking water supplies that naturally contain fluorine. In the United States there are many such communities involving approximately three (3) million people who are supplied by waters containing varying amounts of fluorides naturally. (Testimony, Dr. Hill.)

The program of fluordidating drinking waters by adding fluorides now numbers over 700 communities affecting approximately 14 to 15 million people. (Hill—Doty.)

Municipal water supplies in 141 cities and villages of Ohio contain natural fluorides in concentration from 0.9 parts per million to 3.0 parts per million. (Defendants' Exhibits G and H.)

As of July 1952 the evidence discloses that 357 communities in the United States and territories had fluoridation projects in operation. 400 communities in the United States and territories had approved the projects but have not as yet put them in operation. (See defendant's Exhibit CC—Table, page 28.)

It is of interest to know the attitude of the various public authorities and professional societies with respect to the subject under discussion. It has been testified that the subject has the endorsement and support of (a) The American Dental Society; (b) Council of Pharmacy and Chemistry of The American Medical Association; (c) American Public Health Association; (d) American Association of Public Health Dentists; (e) State and Territorial Health Officers Association; (f) United States Public Health Service; (g) The National Research Council and (h) The Commission report to the President of The United States on the health needs of the nation. (Hill, page 54, Transcript.)

While it was admitted that fluorine or fluorides is a highly toxic chemical, it must be understood that toxicity is a relative term. (Knapp, page 418.) The record, including the transcript of the testimony before the Delaney Committee is interspersed with many statements to that effect. Ingested in sufficient quantities it will produce deleterious effects upon the human being. But, like many other drugs which are taken in quantities prescribed by competent medical prescription, it is definitely non-toxic rather it has proven beneficial.

To further crystallize the question of the meaning of the word "toxicity" as it relates to the use of fluorides certain other items of evidence established in this record should be noted. Millions of people in the United States have been drinking water containing natural fluorides for years and years, with no positive proof of any systemic toxic effect. The amounts of fluorine concentration in some of these localities runs 5, 8 to 14 times the amount intended for use here as to optimum amount of 1 part per million.

The record establishes quite convincingly that when the concentration of fluoride naturally in the waters is above the optimum amount that the continued ingestion of such waters results in endemic dental fluorosis, which indicates that persons experiencing same have ingested toxic amounts of fluorine. As already pointed out, it was this condition that gave rise to the scientific development of fluoridation. But while the dental condition has been established the scientific literature is devoid of any substantial medical evidence that such toxicity has produced any systemic detriments to the people using such waters.

Almost all foods contain traces of fluorine, but most of them contribute a negligible quantity to the daily intake of this element. The occurrence of fluoride in edible foods is widespread and variable. These differences are due to the quantity of fluoride present in the soil and water. The foods with the

highest concentrations of fluorine are various brands of tea, sea foods, rye bread, with lesser amounts found in milk, eggs, butter, cheese, meats, poultry and other foods. (Defendants' Exhibit CC, pages 5-6.)

So that while we consider the subject of toxicity of sodium fluoride we cannot escape the conclusion that it is a poison—if ingested in large quantities. But like many other poisonous drugs, and medicines—taken in quantities that are known to be safe as determined by scientific study and research—even those poisonous drugs or medicines are used to help the human being. This of course is not limited to drugs and medicines. There are many nutrients forming part of our daily diet, used in the preparation of many of our daily edibles which can be so considered.

In view of the endorsements by the various authorities and scientific and professional societies of the fluoridation project we must assume that each, recognizing its responsibility to the public, has concluded that the program is a safe procedure. The record, however, discloses that such conclusion is not unanimous, but on the contrary, is highly controversial. Eminent authorities have expressed their views and have given their reasons for the conclusions that they have reached.

From a study of the mass of testimony and exhibits, including every word of testimony presented before the Delaney Committee (Plaintiff's Exhibit 6), it is noteworthy that practically all of the experts are in accord with the proposition that the drinking of water, whether naturally or artifically fluoridated has resulted in a substantial reduction of dental caries.

The optimum amount as determined for the Cleveland water system is one part per million. (Dr. Knapp, page 478.) Likewise this proposal was approved by Director of Health, State of Ohio, Dr. John D. Porterfield. (See Trans.)

The endorsements of the Dental, Health and Medical authorities above noted is predicated upon the one part per million optimum.

The evidence discloses that only when fluoride content of water supply exceeds 5 or 6 parts per million will prolonged usage give rise to detectable osseous changes and then only in the most susceptible persons. (Heyroth.) The margin of safety is so wide that there is little danger of pathologic or toxic effects.

The evidence establishes that the ingestion of fluorides in the proportion of 1 part per million will probably cause the very mildest dental fluorosis in approximately 10% of the children. The evidence indicates that such a condition is negligible in contrast to the prevalence of caries generally.

No evidence has ever been produced that drinking water containing one part per million has or will harm any living person or thing. (Plaintiff's Exhibit 6, page 1485.)

The proponents of the fluoridation program are of the opinion that it is the fluoride ion that is important and that its influence and effect would be identical whether found in naturally fluoridated waters or where added artificially and that in the same concentrations would act exactly alike on human beings. From a chemical standpoint, there is no basis for assuming that a fluorine concentration of one part per million added acts any differently physiologically than when it occurs naturally in the water supply. The source is the same. It comes from rock phosphate. (Hill, p. 99; Porterfield, p. 561; Knutsen, Plaintiff's Exhibit 6, page 1494.)

This is one of the questions upon which considerable dispute seems to exist. (Plaintiff's Exhibit 6, pages 1533, 1542 and 1569.)

As earlier suggested plaintiff's case is dependent upon such evidence as he could elicit by way of cross-examination of defendants' witnesses, together with exhibits received and the testimony of certain witnesses appearing before the Delaney Committee. (Plaintiff's Exhibit 6.)

It has been shown herein that of children ingesting fluoridated water, at one part per million, approximately ten per cent of such children would probably develop a very mild dental fluorosis, and though considered unimportant or insignificant by defendants' witnesses Drs. Porterfield and Knapp, it is definitely not a normal condition and is one that should not in the opinion of witnesses, be tolerated or imposed upon the populace. (Dr. Marg. Smith—Plaintiff's Exhibit 6, p. 1607.) (Dr. Howard Smith, Plaintiff's Exhibit 6, p. 1618.) For this and other reasons, the latter believes that the program is dangerous and should not be carried out, although he frankly admits that he is in the minority. (Page 1622.)

Several of the witnesses who testified before the Delaney Committee, accepted as experts in their respective fields, were critical of the adoption of the program of fluoridation for many and varied reasons, but underlying their opposition in the main is the almost unanimous feeling that science has not had the time and the opportunity to do the type of extensive and comprehensive research necessary to determine whether or not the fluoridation of public waters would produce systemic ill effects upon children, ill or normal, as well as upon adults who enjoy good health or are suffering from some types of disease.

These objections are not based upon the claims that the program will cause injury. It is rather that as scientists they

feel that fluorine being the toxic element it is, there exists good basis for the belief that it might cause harm that science should protect against.

For testimony contra the program and questions left unanswered see Plaintiff's Exhibit 6, pages 1515, 1516, 1517, 1518, 1587; Smith, p. 1619; Dr. Newman, Plaintiff's Exhibit 6, 1594, 1595, 1596, 1598; Hart, pp. 1570-1571; Taylor, Plaintiff's Exhibit 6, p. 1538; Dr. Hurm, Plaintiff's Exhibit 6, pages 1580, 1581, 1582, 1583, 1585.

The plaintiff, called for cross-examination, admitted that he did not appear before any of the committees of Council considering the subject matter before the court, nor registered any protest to any member of the legislative body or responsible official of the city, because, as he claims, he had no notice of any such hearings or knowledge of the proposed legislation.

The legislation involved was referred to appropriate committees, open public hearings conducted thereon, notices were sent to a mailing list of approximately 200 individuals and organizations inviting them to said hearings, the lists were augmented from time to time, hearings were well attended, both proponents and opponents of the legislation were heard, general public notice was published in the City Record, the official Journal of the City, notices were sent to the Dental Association and the Academy of Medicine, and Dr. John Porterfield, State Director of Health, appeared at the hearings and made statements to the Committee in his official capacity.

It is proposed to use fluorine in quantity to give a concentration to the finished water of one part fluorine per million parts of water.

The evidence discloses that the mechanical equipment to be used is of a standard competent type, to be operated by persons qualified for such purpose, none of whom are either doctors or dentists.

The recommendation by the local Health Commissioner that the proposed program be approved has the approval and endorsement of the local Dental and Medical Societies.

### CONSIDERATION OF QUESTIONS OF LAW.

The plaintiff in his trial brief bases his opposition to the fluoridation program substantially upon eight grounds, four of which are predicated upon alleged violation of rights guaranteed by the Federal and State Constitutions; three as being in conflict with state law; and the last is the claim that the legislation adopted is beyond the power of the municipality to enact.

We shall consider each of the grounds asserted by plain-

tiff but in the interests of orderly analysis, in the group alignment above indicated.

## A. FLUORIDATION AS VIOLATION OF RIGHTS GUARANTEED BY THE FEDERAL AND STATE CONSTITUTIONS.

The specific rights guaranteed by the Federal and State Constitutions claimed by plaintiff to be violated are (1) the right of the individual to the personal liberty to treat his health as he deems best; (2) the right of parents to their personal liberty to rear and care for their children as they deem best; (3) the right to be free from medical experimentation on one's person and (4) the right to freedom of religion. Taking them up in that order, the first is:

### 1. The Right of the Individual to the Personal Liberty to Treat His Health as He Deems Best.

"It is agreed that the sole object for the introduction of inorganic fluoride chemicals into the drinking water of the City of Cleveland is for the prevention of dental caries in children and to give resistance to tooth decay in said children as a preventive therapeutic agent. (Agreed Statement of Fact No. 9.)

It is the contention of the plaintiff that every individual has as a part of his personal liberty the right to protect his health as he deems best to insure a long and happy life, and that the fluoridation of the city water supply deprives him of this right in violation of the Federal and State Constitutions and claims such rights under Amendment XIV to the U. S. Constitution and **Article I, Section 1, of the Constitution of the State of Ohio.**"

There can be no disagreement with this basic principle, it having been long recognized as sound, and the authorities support the proposition. Blackstone Commentaries, p. 134; Thiers on Property; Slaughter-House cases, 116 Wall. 36 (1883); Butchers Union Co. v. Crescent City Co., 111 U. S. 746 (1884), concurring opinion of Mr. Justice Bradley; Meyer v. Nebraska, 262 U. S. 390 (1923); Jacobson v. Massachusetts, 197 U. S. 11 (1905).

This right in an individual, however, is not an absolute right but is subject to the police power of the state. This proposition is frankly recognized by the plaintiff, and he concedes that such right is subordinate to the police power of the state.

But he argues that there must be some overriding public purpose which would justify the exercise of such police power. In his language the basis of the exercise of the police power must be public self defense, citing Jacobson v. Mass., supra; Chy Lang v. Freeman, 92 U. S. 275; and Freunds, "The Police Power, Public Policy and Constitutional Rights," p. 116; **State**

ex rel. Bowman v. Com'rs., 124 Oh St 174 (1931); Syls. 3-5-6; Ex Parte Company, 106 Oh St 50; State ex rel. Milhoof v. Bd. of Ed., 76 Oh St 297, p. 306; Railroad Co. v. Husen, 95 U. S. 465 (1887). From these cases, it can be seen, plaintiff urges, that only when there exists a present danger, necessity or emergency are the rights of the individual subordinate to the right of the public. It is only when the rights of all are endangered that laws concerning public health are valid. As examples he cites quarantine regulations, laws relating to vaccination against smallpox; control of venereal disease.

Just what limitations are there upon the state in its exercise of police power with respect to the legislation here considered? Without question it purports to be a public health measure. The competency of the state to pass a public health measure was established a long time ago.

Quite pertinent to the question is the language of the Supreme Court in the case of **Board of Health v. City of Greenville, et al., 86 Oh St 1,** at **pages 22-23** of its opinion, wherein the Court says—

"This power (police power) includes everything which is reasonable and necessary to secure the peace, safety, health, morale and best interests of the public. It is now the settled law that the Legislature of the State possesses plenary power to deal with these subjects so long as it does not contravene the Constitution of the United States or infringe upon any right granted or secured thereby, or is not in direct conflict with any of the provisions of the Constitution of this state, and is not exercised in such an arbitrary and oppressive manner as to justify the interference of the courts to prevent wrong and oppression."

In **Leonard Jr. v. State, 100 Oh St 456, Syl. No. 1**—the court holds:

"The measure of police power available to the government is the measure of public need, whether it apply to health, safety, protection or general welfare, except as qualified by state and federal constitution."

In **State ex rel. Bowman v. Commissioners, 124 Oh St 174,** the Supreme Court in its 3rd Syl. states—

"Whether the purpose to be served by legislation pursuant to the police power of the state bears a reasonable and substantial relation to the public welfare is a justiciable question. The wisdom of such legislation, the extent of the threatened danger, and the efficacy of the remedy are political questions."

From these holdings it is apparent that when a legislative body enacts a public health measure which is (1) reasonable and necessary to secure the objects thereof, (2) does not con-

travene the constitution of the United States or infringe upon any right granted or secured thereby, or (3) is not in direct conflict with any provisions of the Constitution of this state, and (4) is not exercised in such an arbitrary and oppressive manner as to justify the interference of the courts to prevent wrong and oppression, it is a valid measure.

The health measure with which we are concerned is designed to prevent caries in children and to give resistance to tooth decay. Dental caries is a serious and widespread disease. Clearly any reasonable measure designed to decrease or retard the incidence of dental caries is in the interest and welfare of the public. While the disease is attacked primarily in the formative years of child life, the benefits derived as a result last through a substantial part of adult life. Children do become adults. The program definitely bears a real, reasonable and substantial relationship to the objects sought, namely the improvement of dental health of the public, and the exercise of the power as designed is no wise arbitrary or oppressive.

Plaintiff is at odds with this proposition. In his answer brief he argues: Defendant's answer to plaintiff's contention that fluoridation is an invasion of an individual's liberty to protect his health as he deems best seems to be as follows: An individual has the constitutional right to protect his health as he deems best, and, although fluoridation is an invasion of that right to personal liberty it must yield to the police power the exercise of which is measured by the public need for protection. Hence, defendants state any measure designed to promote the public health is within the police power of the state regardless of the rights of individuals.

He cites the additional cases of **State ex rel. Bowman v. Commissioners, 124 Oh St 174 (1931) Syl. Nos. 3, 5 and 6; Ex parte Company, 106 Oh St 50 (1922); State ex rel. Milhoof v. Bd. of Ed., 76 Oh St 279 (1907).**

It might be well to examine the cases cited by plaintiff in his original and answer brief. Plaintiff cites Railroad Company v. Husen, 95 U. S. 465 (1877), as an instance in which a health law which served "no apparent public purpose" was held invalid. The actual decision there was that a state law which interferes with Interstate Commerce, though purporting to be a public health measure, cannot stand in respect to such commerce against the constitutional ordination that Congress shall have power to regulate the same. This view of the case is fully supported by the opinion in the Jacobsen case, supra, at page 28 of the report.

Since the Interstate Commerce clause is not, and cannot be,

invoked in the instant case, the Husen case is definitely not in point' or helpful. The case of Chy Lung v. Freeman, et al., 92 U. S. 275 (1875), is equally impotent as an authority in this case. The right to which the court was addressing itself in the partial quotation on page 9 of plaintiff's brief was "the right of the states to pass statutes to protect themselves in regard to the criminal, the pauper, and the diseased foreigner landing within their borders" and the Court held, that if the right exists at all it cannot "extend so far as to prevent or obstruct other classes of persons from the right to hold personal and commercial intercourse with the people of the United States."

State ex rel. Bowman v. Com'rs., supra, was an action seeking a writ of mandamus to compel the county commissioners to meet the obligations imposed by certain bonds issued by said commissioners for the construction of public sewers. This case did not involve the question as to whether the construction of sewers was a public health measure, nor was the liberty of anyone an issue in the case. It turned upon the good faith of the commissioners to provide for the construction of sewers under the circumstances pleaded in said action and the rights of innocent bondholders vs. taxpayers whose elected representatives the commissioners were. It is manifest however, that when counsel takes from the context extracts such as "present menace" or a "substantial menace to health," which the court used in syls. 5 and 6, without relating them to the sense in which they are used and the issues to which they relate, one can easily be led astray. This case does not decide that to be a proper public health measure it must at all events involve a present overriding public necessity, menace or danger of epidemic. The fact is that the court in effect upheld the bonds as issued, notwithstanding the court was of the opinion that the sewers involved were wholly unnecessary for the reason stated in the opinion of the case.

In the cases Ex Parte Company and Irvin, supra, the court upheld certain regulations adopted by the Public Health Council of the State Department of Health, dealing with the examination, quarantine and detention of individuals suspected of affliction with veneral diseases, as a lawful exercise of the police power of the state. Here again the Supreme Court refers to venereal diseases as a "menace to health" as cited by plaintiff. Certainly, the issue before the Court not only warranted the use of the term "menace to health," which everyone recognizes veneral diseases to be, but the Court has nowhere used that term in the sense that plaintiff uses it, namely, that only in cases where there is an overriding necessity, is a public health measure proper.

The last case cited by the plaintiff, State ex rel. Milhoof v. Board of Education, supra, is one which plaintiff claims that the Court, at page 306, stresses "the nature of smallpox in upholding a vaccination law." Here again, no one in this modern age will question either the terrible effects of smallpox nor the value of vaccination as a preventive thereof. This case again does not place upon the state the limitation claimed by plaintiff. As a matter of fact, a studious reading of the opinion, throws some much needed light upon the very problem we are discussing, whether there must be some overriding public necessity or epidemic actual or impending.

The case involved a regulation adopted by the Board of Education, pursuant to a statute, that children attending public schools must be vaccinated against smallpox and on failure thereof, they are to be excluded until the regulation was complied with. It was established as a matter of record "that the disease of small pox is not prevalent in the village, school district nor in the community of relator's residence, nor has there been a threatened epidemic of smallpox for years. There was no evidence tending to show any exposure of said children" (page 305, Court's Opinion) and it was claimed that a rule or regulation requiring vaccination as a prerequisite to the right to attend public schools becomes and is unreasonable, and can not be enforced, at a time when smallpox does not exist in the community, and there is no reasonable ground to apprehend its appearance. The Court struck down this argument in the following words:

"Such claim necessarily assumes that the power conferred upon Boards of Education by Sec. 3968, Revised Statutes, can not rightfully be exercised by them unless at the time of its exercise smallpox actually exists in the community, or an epidemic of the disease is then reasonably to be apprehended. But such statute conferring the power, has imposed no such condition or limitation upon its exercise, and we know of no reason or authority from which such condition may be implied."

Nothing in the foregoing case supports plaintiff's contention that to be an effective public measure some immediate, overriding public necessity must exist. If anything, it indicates that the lack of the presence or existence of any immediate danger is quite immaterial.

The subject of fluoridation, and the questions in dispute noted above have been the subject of judicial inquiry and determination elsewhere in the United States. In each instance fluoridation was judicially upheld against legal challenge. Most of the decisions are by courts of first instance

in the jurisdictions where adjudicated. The cases decided are unreported but we do have before us, the opinions, findings and order for decree, and journal entries, all of such having been furnished as appendices to defendants' brief, and counsel represents to the court that such documents were obtained through authentic sources.

The first such case is that of de Aryan v. Butler, Mayor, et al., Superior Court, San Diego County, California, No. 169,974. Plaintiff sought an injunction against city officials to restrain them from carrying out a program for fluoridation of municipal water supply. On motion for non-suit the motion was granted April 3, 1952. Among the contentions disposed of adversely to plaintiff in the memorandum of opinion of the Court were these:

"That fluoridation of the water supply is an invasion of the constitutional rights of citizens in that it subjects them to mass medication whether they need it or not; (2) that fluoridation infringes upon the religious freedom of those citizens whose beliefs are opposed to the taking of medicine in any form; (3) that fluoridation is undoubtedly harsh and oppressive in that there is no emergency making it necessary; (4) that no epidemic impends which fluoridation would tend to relieve, and (5) that fluoridation would tend to prevent no contagion or infection."

The de Aryan v. Butler case, supra, is particularly noteworthy in that the Court dealt with precisely the question here in point and held that "an emergency is not necessary before the police power can be exercised" and that "no epidemic is necessary" and "no danger of contagion or infection is necessary" citing as his authorities for the various propositions cases decided by the California Courts (Miller v. Board of Public Works, 195 Calif. 477; Justensen's Food Stores, Inc. v. City of Tulan, 12 Calif. [2] 324).

The supplemental briefs filed by counsel indicate that the decision in the de Aryan case supra, was appealed to the Appellate Court for the Fourth District of the State of California where the order of the lower court was affirmed, without division and with opinion. Noteworthy and pertinent is the language of said court, wherein the court say:

"We therefore conclude that the addition of fluoride to the water supply, as directed by resolution of the City Council, was a valid exercise of the police power of the City of San Diego, so long as it was not unreasonable or an abuse of discretion so to do. (Laurel Hill Cemetery v. San Francisco, 216 U. S. 358, 30 S. Ct. 301; Roussey v. City of Burlingame, 100 Cal. App. 2d, 321.) The determination by the legislative body

that a particular regulation is necessary for the protection or preservation of health is conclusive on the courts except only to the limitation that it must be a reasonable determination, not an abuse of discretion, and must not infringe rights secured by the constitution. (Powell v. Commonwealth of Pennsylvania, 127 U. S. 678, 8 S. Ct. pp. 992 and 1257; Jacobson v. Commonwealth of Massachusetts, 197 U. S. 11, 25 S. Ct. 358; In re Lowenthal, 92 Cal. App. 200.)"

Throughout the course of the decided cases, dealing with the application of the police power by the state, the courts have always related the exercise of such power to the public necessity. Mr. McQuillin, in his work on Municipal Corporations, Section 24.09 page 460 states the rule in the following language:

"A reasonable exercise of the police power is one required by public **necessity,** and public **necessity** is the limit of the legitimate exercise of the power. The **public need is the polestar for the enactment,** interpretation and application of police measures." (Emphasis supplied.)

This principle finds support in a decision of our own Supreme Court already referred to wherein the court held that:

"The measure of police power available to the government is the measure of public need, whether it apply to health, safety, protection, or general welfare, except as qualified by State and Federal Constitution." (Leonard Jr. v. State, supra.)

This case was one involving the violation of a statute familiarly known as the Smith Cold Storage Act, providing penalties for holding poultry, etc., in cold storage for longer periods than provided by the statute. The constitutionality of the act was under attack, it being claimed that the provision of the statute invades **Defendant's Constitutional Rights.**

Lest there be some question that the measure under attack be something other than a health measure the language of the court in its opinion, page 460 should be noted: "The act in question, it is reasonable to presume, had two legislative purposes, one pertaining to **health** and the other to **hoarding.** The first was to be **promoted,** the latter to be prevented. The act clearly has a **pertinent relation to both.** Both are clearly within the constitutional right of the general assembly and none of the provisions of the law is violative of the defendant."

No one would seriously contend that the adoption of the so-called Smith Cold Storage Act was prompted by some overriding public purpose, or public self defense, in the sense urged by counsel as illustrated by the cases which he cites dealing with quarantine regulations, vaccination against small-

pox or control of venereal diseases. The Court approved the legislation as a public health measure notwithstanding it did not involve the type of legislation suggested by plaintiff. But more important, a study of that case clearly demonstrates that the proper exercise of police power by a state, to which constitutional guarantees of personal rights must yield, and the restraints imposed held subordinate to the public welfare, for reasons much less important than that of the health of a community, or a substantial part thereof. The Court recognized that one of the primary purposes of the legislation in question "was undoubtedly to force these goods upon the market within the time limit, rather than afterward," to prevent hoarding. One may reason, if the police power of the state may be exercised reasonably for purposes involving economic problems when they promote the public welfare, certainly legislation that is designed to promote public health, operating in a reasonable manner, must be approved.

The Appellate Court in the de Aryan case supra, in its opinion states

"It does not appear from the evidence produced that the ordinance is a plain, palpable invasion of the rights secured to petitioner by the fundamental law, nor does it appear that it violates any policy or laws of the State of California or that by reason of the facts established the ordinance is in the respects indicated unconstitutional."

Speaking of the invasion of rights guaranteed by the Constitution, the same court says:

"The U. S. Supreme Court, in establishing and clarifying the constitutional right of religious and other freedoms, has distinguished between the directed compulsions imposed upon individuals, with penalties for violations, and those which are indirect or reasonably incidental to a furnished service or facility. (Hamilton v. Regents of the University of California, 293 U. S. 245, 55 S. Ct. 197; West Virginia State Board of Education v. Barnette, 319 U. S. 624, 63 S. Ct. 1178; Cantwell v. State of Connecticut, 310 U. S. 296, 303, 60 S. Ct. 900.)"

### Limitations Upon the Right of a Court to Interfere With Legislative Enactment Under Police Power.

It has long been established that it is for the legislature and not for the courts to determine in the first instance whether such measure is or is not the best mode of protecting the public health. Local subdivisions may be invested by the state with authority to act with respect to public health matters. Jacobson v. Mass., supra.

The Council of the City of Cleveland, after public hearings, at which both proponents and opponents were afforded an

opportunity to be heard on the legislation providing for the fluoridation of Cleveland's public drinking water, enacted the legislation by a proper vote. The proceedings were in all respects regular and according to law.

The question therefore arises as to whether this Court may interfere with said enactment because the fluoridation of public waters is a highly controversial subject; because there remain many questions unanswered as to the effects of such program upon the general health of the public; because it is thought unwise to proceed with it at present in the face of such uncertainty and many kindred questions.

The soundness or wisdom of the legislation, the extent of the threatened danger, and the efficacy of the remedy are political questions, with which the legislative body is alone concerned. There are definite limitations upon the right of the judiciary to interfere or upset legislation duly enacted under the police power of the state. Such limitations are clearly expressed by the highest judicial authorities, both federal and state.

Justice Harlan, in the case of Jacobson v. Massachusetts, supra, gives expression to such limitations in the following declaration:

"If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that if a statute purporting to have been enacted to protect the public health, the public morals or the public safety has no real or substantial relation to those objections, or is, beyond all question a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge and thereby give effect to the constitution."

The Supreme Court of Ohio has fully accepted these principles. State Board of Health v. City of Greenville, supra; **City of Bucyrus v. State Dept. of Health, et al., 120 Oh St 426 (1929); Shook, et al. v. Mahoning Valley Sanitary District, et al., 120 Oh St 449 (1929); State ex rel., Southland, Dis. of Health v. City of Columbus, et al., 128 Oh St 295 (1934).**

While it is true that the record in this case discloses that there are several eminent experts who are, to say the least, skeptical of the value of the fluoridation program, and they are in the minority, the vast part of the public, both lay and professional, are of the contrary opinion. Our Supreme Court in **State, etc. v. Board of Education, 76 Oh St 297,** at **page 307** of its opinion quotes with approval a statement by the New York Court of Appeals, in a case dealing with vaccination, which language is pertinent herein:

"The possibility that the belief may be wrong and that science may yet show it to be wrong is not conclusive, for the legislature has the right to pass laws which, according to the common belief of the people are adapted to prevent the spread of contagious diseases. In a free country, where the government is by the people through their chosen representatives, practical legislation admits of no other standard of action, for what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not. Any other basis would conflict with the spirit of the constitution and would sanction measures opposed to a republican form of government."

In view of these authorities, this Court reaches the conclusion that the right of an individual to treat one's health as he deems best, as claimed by the plaintiff, is a right which he must yield to the common good, where a state, or local subdivision, in the lawful exercise of its police power, enacts a public health measure, deemed necessary for the promotion of the health of a substantial segment of its population. The principle upon which this conclusion rests is aptly expressed in the words of Justice Harlan in the Jacobson case, supra, wherein he states:

"The liberty secured by the Constitution of the United States to every person within its jurisdiction does not impose an absolute right in each person to be, at all times, and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society cannot exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy."

With these principles of law in mind, we proceed to examine the remaining objections raised by plaintiff. The next of these deals with:

## 2. The Right of Parents to Their Personal Liberty to Rear and Care for Their Children as They Deem Best.

Plaintiff in his brief contends that "Parents have a constitutional right to direct and control their children and this proposition is well settled in American Law," citing Meyer v. Nebraska, 262 U. S. 390 (1923); that "Parents are the natural guardians of their children and are entitled to their custody and control. The right is in the nature of a trust reposed in them and is subject to the correlative duty to care for and protect their children. This duty to care for and protect their children extends to the care and protection of the children's health. Therefore, it is a well established

rule that no surgical operation may be performed on a child until consent is first obtained of the natural guardian or one standing in loco parentis to the child." For his authorities plaintiff cites: Bonner v. Morgan, 126 Fed. (2nd) 121, 139 A. L. R., 1366 (1941); Perry v. Hodgson, 168 Ga. 678, 148 S. E. 659 (1929); Zoski v. Gains, 271 Mich. 1, 260 N. W. 99 (1935); Rogers v. Sells, 178 Okla. 103, 61 P. (2nd) 1081 (1936); In re Hudson, 126 P. (2nd) 765 (1942).

Plaintiff further urges that it is only when the parents fail to perform their natural duty to properly care for the child so that its fundamental welfare is in danger, that the State, as parens patriae of all children, may assert its power and apply curative measures to prevent injuries to the child and to society by the wrongful and negligent conduct of the parents. He urges that the adoption of the Juvenile Court Code is a plain recognition of such paramount right of parents.

The plaintiff in his brief in support of his argument quotes a passage from the opinion of the court in the case of Price, Governor v. Society of Sisters, 268 U. S. 510 (1925).

"Under the doctrine of Meyer v. Nebraska, 262 U. S., 390, we think it entirely plain that the act of 1922 unreasonably interfered with the liberty of parents and guardians to direct the up-bringing and education of children under their control. As often heretofore pointed out rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competence of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with high duty, to recognize and prepare him for additional obligations."

In Meyer v. State of Neb., 262 U. S. 390 (1923), a statute forbidding under penalty the teaching of any modern language other than English in the public and private schools in this state was held to be incompatible with the XIVth Amendment as to a teacher against whom the penalty was invoked.

In Price, Governor v. Society of Sisters, 268 U. S. 510 (1925), the court struck down a statute which would have required all children between six and sixteen to attend public schools exclusively.

In each case the decision turned not alone on the rights of parents to do as they see fit with their children but also on the more salutary principle that the action of the State

was arbitrary and bore no reasonable relation to any end within the competency of the State to achieve.

Plaintiff seems to have overlooked the full significance of the language of the court. The court struck down the particular act because it unreasonably interfered with the liberty of parents and guardians to direct the upbringing and education of children under their control, and apparently, as the court concluded, the act "bore no reasonable relation to some purpose within the competence of the State."

Clearly those decisions are completely consistent with the holdings of the same court earlier noted in our discussion of the liberty of adults. They recognize that measures adopted lawfully under the police power of the State are proper attributes of sovereignty. They are likewise quick to strike down measures that are not. Compulsory attendance at school and compulsory vaccination are concepts so widely sustained and upheld that there remains little room for argument that parental rights with respect to the care of their children are subordinate to the right of the State to act reasonably and responsibly for the protection of the child.

In answer to the defendants' position, which is in substance the same as that just expressed by this Court, plaintiff in his answer brief gives expression to the following immoderate outburst:

**"Defendants state, in effect, that the Government is supreme in acting for the protection of children: This is the United States, not Russia, where children are wards of the State."** (Emphasis supplied by plaintiff.)

This Court recognizes that the fairest of counsel frequently, in their zeal for a client's cause, yes, in the interests of their own cause, are led to some strange conclusions, make some unreasonable statements and resort to specious if not irresponsible arguments. Does plaintiff in this case suggest that defense counsel by advocating the basic principle of the proper exercise of the police power by a sovereign state or subdivision seeks to bring about conditions incompatible with the treasured fundamentals of our nation?

Does counsel suggest that this Court by his recognition of these basic principles has the same objective?

A cursory reading of the reported cases, textbooks and literature on the subject of Police Power will reveal to the plaintiff that the Police Power of a sovereign state exercised within the framework and limitations of our Constitution, has contributed tremendously to the welfare of our nation and its people. Did the recognition of the principles of compulsory vaccination, or compulsory attendance at school convert the children of the United States into wards of the State? Does

the chlorination of water ingested by children have any such results? Nowhere is it suggested that by the adoption of these reasonable and healthful measures and many, many others, have children because of these salutary precautions for their wellbeing been made wards of the State. Ideological implications such as these are wholly unworthy of plaintiff. They are unreasonable and unnecessary and have no place in this litigation.

Plaintiff, in addition to the cases earlier noted, cites additional cases as supportive of his position. He claims they are cases which state in unequivocal language that these constitutional rights are forfeited where parents neglect their child. He cites:

In re Hudson, 126 P. (2d) 765 (1942); Heinemann's Appeal, 96 Pa. 112, 42 Am. Rep. 532 (1880); People ex rel. Wallace v. Labrinz, 411 Ill. 618, 104 N. E. (2d) 769; Morrison v. State, — Mo. App. —, 252 S. W. (2d) 97 (1952); In re Rotkowitz, 175 Min. 948, 25 N. Y. S. (ad) 624 (1941); In re Vasko, 238 App. Div. 128, 263 N. Y. S. 552 (1933).

In .Re: Hudson, supra, the court dealt with the claimed necessity for a surgical operation upon an infant. In re Heinemann's Appeal, supra, dealt with the right of a court to appoint a guardian for remaining two minor children where father neglected wife and three children all of whom died. In Re: Vasko, supra, the court approved a surgical operation upon an infant where neglect of parents was shown. In Re: People ex rel. Wallace v. Labrinz, supra, the court approved the appointment of a guardian for an infant eight days old, who would consent to blood transfusions to save the life of the infant, or its threatened mental impairment, notwithstanding parents' objections as violative of constitutional guarantee of right of freedom of religion. In Re: Rotkowitz, supra, the court ordered surgical operation upon 10 year old infant, upon application of mother, over objection of father, who was charged with neglect. The Court has been unable to find the remaining case, namely, Morrison v. State, cited as 252 S. W. (2nd) 97 (1952), due apparently to an erroneous reference.

These cases, being inapplicable, offer no help in the problem here under consideration. They do firmly establish the principle that government will not interfere with the right to the control and custody of minor children by their parents, except in cases of neglect or delinquency of such children, in which situation the children become wards of the State. And the status of such children as wards of the State does under no circumstances carry the connotation suggested by plaintiff.

Having concluded that the liberty of an individual to treat one's health as he deems best is subordinate to the lawful exercise by the State of its police power, it follows that the same principles would govern the specific right claimed for parents to care for the health of their offspring.

**3. Plaintiff's Right to be Free from Medical Experimentation.**

Plaintiff's position is set forth quite concisely in his trial brief. It reads:

"There is no question but that the addition of inorganic fluoride chemicals to the city water supply for the purpose of preventing dental caries is an experiment. (Agreed statement of fact No. 18.) This also inevitably follows from the fact that there is a difference of opinion in the United States as to the value of adding inorganic fluoride chemicals to prevent and reduce dental caries in children, and also as to its effect on the health and well being of the adult population. (Agreed statement of fact No. 18.)

"It is plaintiff's contention that since it is conceded that the addition of inorganic fluoride chemicals to the city water supply is an experiment, and this experiment vitally affects each and every user of city water, the ordinance providing for the addition of inorganic fluoride chemicals is a violation of the individual user's constitutional right to liberty."

In support of his position plaintiff relies almost entirely upon the principles applicable to medical experimentation as pronounced by the American Military Court set forth in its opinion concluding the war criminals trial before the Nuernberg Military Trials following World War II, in the case of Gebhardt and other German doctors who were on trial for experiments conducted on human beings. Plaintiff quotes at length from defendant Gebhardt's final plea recorded in mimeographed transcript of the trial, July 15, 1947, pages 10874 to 10911, and also "Trials of War Criminals" at pages 71, 72 and 73. The part of the opinion of the American Military Court cited as reported at pages 181 to 183.

Defendants' answer to this contention is found in the following language of defendants' brief:

"Plaintiff further contends that fluoridation of the water supply is an experiment; that for the municipality to indulge in such an experiment is an invasion of personal liberty. In an effort to give the point some emotional appeal, plaintiff resorts to Nuernberg Tribunals as proof that world sentiment emphatically rejects mass experimentation on human beings. The fallacy in the argument lies in the fact that in plain-

tiff's view a measure designed to reduce the incidence of dental caries as an accepted and proven public health measure is indistinguishable from the practices of the Hitler regime in Germany between 1939 and 1944. Those practices had for their object extinguishing of people. Fluoridation is aimed at the reduction of a wide spread disease by adoption of preventive measures. Improved dental health is the goal which is sought. The method has the sanction of experience which is wide spread and proven."

Plaintiff's response to defendants' position is found in his answer brief and is as follows:

"Defendant's answer to Plaintiff's contention that fluoridation is an experiment and thus unconstitutional is that merely because there is a difference of opinion as to the merits of the proposed program the court cannot reject the program.

Defendants entirely disregard the very nature of an experiment in begging the question in their argument. The evidence in this case shows that the proponents of fluoridation did not know if artifically introduced fluoride chemicals would act on the teeth of children in the same way in which natural fluoride would act; they did not know the effect of artificially introduced fluoride on the adult population, nor do they know whether their basic theories on these subjects are correct. In fact, all the scientific proponents of fluoridation know are the results of partially completed experiments on only one of these problems, the effect of artificially introduced fluoride chemicals on the teeth of children and those experiments have from three to seven years yet to run to completion and have been in effect only since 1946."

He argues further that the Jacobson case, supra, does not support the defendants' position for two reasons (1) that vaccination then sanctioned was no longer an experiment having been in use for over one hundred years and its effects completely known and (2) that in that instance the legislature was "compelled by necessity" to choose between the theories that vaccination was beneficial or harmful and points to the language of the court wherein the court stated:

"The State Legislature proceeded upon the theories which recognize vaccination as at least an effective if not the best known way in which to meet and suppress the evils of a smallpox epidemic that imperiled an entire population."

He concludes his argument in the following words:

"In the words of the Supreme Court of the United States in the case of Truax v. Corrigan, 257 U. S. 312, at page 338: 'The Constitution was intended, its very purpose was, to prevent experimentation with the rights of the individual.' "

We find upon examination of the Truax case, supra, no applicability to the subject of experimentation of the type under discussion.

In view of the fact that the parties have agreed that the addition of inorganic fluoride chemicals to the city water supplies for the purpose of preventing dental caries is an experiment the court was greatly concerned with the present status of the subject as well as its history, particularly since plaintiff raises the question of the constitutionality of the legislation in relation to the right to be free from experimentation.

The court has spared no effort, nor any investment of time to review the evidence received in this case to determine to what extent we are dealing with experimentation, if at all. While it is true that there is a difference of opinion in the United States as to the value of the program for the purpose sought, and also as to its effect on the health and well being of the adult population, the statement, or argument that the degree of risk taken exceeds the importance of the problem to be solved is refuted by the overwhelming weight of the evidence.

Certainly there is a difference of opinion among the experts, but what question of a scientific nature is free from such divergence of opinion? One could point to innumerable instances of medical and scientific discoveries that are generally accepted and still find plenty of skeptics who might be opposed to the adoption of such discoveries. A review of the record indicates quite clearly that the opponents of this measure are in the minority. This was admitted by witnesses heavily relied on by plaintiff.

We cannot escape the conclusion that, although the study of fluorides, dental fluorosis, the effect of the ingestion of fluorides has been going on for decades, there are still many important phases of fluoridation which Dr. Blaney now regards as a blessing, that leave much room for further study and research. The same holds true for practically everything science deals with. The evidence of the opponents of the program is of a negative character. Their position is that this, that or other thing is possible, hence, it ought not be adopted; we should await further developments, etc. But the support of the measure by the U. S. Public Health Service, the American Medical and Dental Societies, the many high officials charged with the responsibilities for the health of state populations who are satisfied that any deleterious risks are negligible, the published evidence from the many communities where fluoridated waters have been ingested for years

and years, among them many in our own state, is quite convincing that the program as proposed does not involve any appreciable risk and that the importance of the problem of dental caries warrants the adoption of the measure.

In this connection, it is necessary, once more to refer to the language of the highest tribunal of our state in the Bowman case, supra, that "the wisdom of such legislation, the extent of the threatened danger, and the efficacy of the remedy are political questions." See also quotation from the case of **State etc. v. Board of Education, 76 Oh St 297, page 307,** supra.

Clearly the evidence in this case does not establish the fact that that proposed program as designed is in any sense harsh, oppressive or dangerous to such degree as would warrant a court of equity to set it aside as an abuse of discretion by the legislative body, or that the municipal council was unfamiliar with the divergent views upon the subject.

Under the circumstances the court concludes that the right claimed by plaintiff under this head must, like the other disposed of, yield to the common good.

#### 4. The Right to Freedom of Religion.

The parties have agreed that there are many residents of the city of Cleveland whose religious beliefs forbids them to take medication for the prevention or treatment of any disease. (Agreed fact No. 16.)

Plaintiff claims that the fluoridation of water supply compels people to take a form of medication contrary to their religious beliefs in contravention of **Article I, Secs. 1 and 7 of the Ohio Constitution** and Amendment I of the Constitution of the United States. The cases cited by plaintiff are West Virginia Board of Education v. Barnette, 319 U. S. 624 (1943); Cantwell v. Connecticut, 310 U. S. 296 (1940). The former was the compulsory flag salute case, claimed to be contrary to the religious beliefs of the Jehovah's Witnesses, and was so held by the U. S. Supreme Court.

It is pointed out by the court in the second case cited by plaintiff, Cantwell v. Connecticut, supra, that freedom of religion has a dual aspect, freedom to believe, and freedom to act exercising such beliefs. The first is an absolute right, the second is not an absolute right, but may be regulated for the protection of society. This is conceded by plaintiff but he urges that fluoridation violates both aspects.

By way of brief, the defense points out what is a matter of record that plaintiff did not testify in his own behalf. As a consequence we are not advised whether plaintiff has any religious scruples at stake. No witness appeared to testify

to any religious belief or practice at odds with fluoridation. Plaintiff of course relies upon the agreed statement of fact No. 16 above set forth.

Whether any one appearing before the Council Committees opposed the fluoridation program on this basis does not appear upon the record.

While it appears that plaintiff has failed to establish or prove injury, or probable injury to himself, an invasion of the right of religious freedom creates a cause of action. The issue is, does fluoridation amount to such an invasion? Plaintiff insists that it does. The defendants deny it.

Turning our attention to an analysis of the cases cited by plaintiff we find that in West Virginia State Board of Education, et al. v. Barnette, supra, "It is held by a six to three decision that the action of the state in making it compulsory for children in the public schools to salute the Flag and pledge allegiance violates the 1st and 14th Amendments" * * * "as applied to children who were expelled for refusal to comply, and whose absence thereby became 'unlawful,' subjecting them and their parents or guardians to punishment."

The integral elements of that controversy are stated with clarity in the following excerpts from the opinion of Mr. Justice Jackson—

"Children of this field have been expelled from school and are threatened with exclusion for no other cause. Officials threaten to send them to reformatories intended for criminally inclined juveniles. Parents of such children have been prosecuted and are threatened with prosecutions for causing delinquency." (Page 630.)

"Failure to conform is 'insubordination' dealt with by expulsion. Readmission is denied by statute until compliance. Meanwhile the expelled child is 'unlawfully absent' and may be proceeded against as a delinquent. His parents or guardians are liable to prosecution, and if convicted are subject to fine not exceeding $50.00 and jail term not exceeding 30 days." (Page 629.)

"The sole conflict is between authority and rights of the individual. The state asserts power to condition access to public education on making a prescribed fine and provision and at the same time to coerce attendance by punishing both parents and child. The latter stand on a right of self determination in matters that touch individual opinion and personal attitude." (Page 630.)

The second case relied upon by the plaintiff, Cantwell v. Connecticut, supra, is one in which "the Court struck down a state law which under the guise of regulating the use of the

streets effectively forbade the distribution of religious literature by any other than an officially approved religious group." The Court did, however, make it crystal clear (pages 303-304) that "freedom to act in the exercise of religion is subject to regulation for the protection of society" and suggesting that such a regulation "in attaining a permissible end does not usually offend the constitutional guarantee."

Both the Barnette case and the Cantwell case, supra, are clearly distinguishable on the facts from the situation here under consideration. Both of these cases imposed direct compulsion upon individuals with penalties for violations. None such exist in the present situation.

True, the City of Cleveland is the sole supplier of public drinking water within the city. But it must be borne in mind that there is no absolute duty on the part of the city to supply water. The city having undertaken to do so by reason of its contract is duty bound only to furnish water that is potable, palatable and pure. It is agreed that fluoridation will have no effect deleterious or otherwise upon its potability, palatability or purity, that it leaves such water colorless, ordorless and tasteless. There is in this case no affirmation of belief or attitude of mind required of anybody. Citizens opposed to drinking or using fluoridated water if there are any such are free not to do so. Resort to other sources for non-fluoridated water may pose a problem of convenience and, possibly, of economics, for some persons, but it does not present a wholly impossible situation.

It is contrary to the religion of some persons to send their children to school at all. Yet the state may compel them to do so. Commonwealth v. Beiler, 168 Pa. Super. 462, 79 A. (2d) 134 (1952); Rice v. Commonwealth, 188 Va. 224, 49 S. E. (2d) 342 (1948); State v. Bailey, 157 Ind. 324, 61 N. E. 730 (1901).

The right to religious freedom is not beyond all interference by the state. Many illustrations of this principle are found in the reported cases. The vaccination cases are illustrative of the point in question. Three of the most recent cases are: Sadlock v. Board of Education, 137 N. J. Law, 85, 58 A. (2nd) 218 (1948); Mosier v. Barren County Board of Health, 308 Ky. 829, 215 S. W. (2d) 967 (1948); and State v. Drew, 89 N. H. 54, 192 Atl. 629 (1937).

It might be argued that because vaccination was designed to protect against infections and dangerous diseases the courts subordinated the individual right to religious freedom to the common good. But we have shown earlier herein that, so far as Ohio is concerned, the right to enact a health measure is not dependent upon the presence or prevalence of an in-

fectious, communicable or dangerous disease. Public necessity as determined by the legislative body is the test.

The State and the local subdivision has an interest in the dental health of the children within its confines. There is no doubt as appears from the record that the disease of dental caries is prevalent and that it is perhaps the most widespread of all diseases. The public authorities consider it serious enough to render action against it necessary and desirable. To urge that it is less deadly than smallpox or tuberculosis is beside the point. The disease exists, the proposed program is designed to prevent and retard it. It is designed to promote the dental health of the children, who soon enough become adults and, as such, will garner the benefits thereof.

Reference has already been made to the only case involving fluoridation which has had the attention of a reviewing court anywhere in the United States. It is the de Aryan case, decided by the Fourth District Appellate Court of California. We have heretofore quoted from the opinion of said court to the effect that:

"The United States Supreme Court, in establishing and clarifying the Constitutional right of religious and other freedoms, has distinguished between the direct compulsions imposed upon individuals, with penalties for violations, and those which are indirect or reasonably incidental to a furnished service or facility."

One of the cases cited by said court as its authority for that statement is the case of Hamilton v. Regents of The University of California, 293 U. S. 245, 55 S. Ct. 197. This case, a suit on behalf of certain minors who had been refused admission to the University of California because, from religious conviction, they refused to take the required course in military science and tactics. The Supreme Court upheld the statute requiring students at the University to take the course, despite the fact that the state university "affords opportunity for education such as may not be had at any other institution in California except at a greater cost which these minors are not able to pay."

From that case may be deduced the principle that a state in providing services to its people, may provide them on a condition the fulfillment of which is contrary to the religious scruples of some. While the Hamilton case did not involve the fluoridation question the principle there applied to education is equally applicable to the subject of fluoridation of drinking waters.

As previously indicated, freedom to act in the exercise of religion is subject to regulation for the protection of society. When government in the proper and lawful exercise of its

police power seeks to attain a permissible end, in this instance a health measure both necessary and desirable, the constitutional guaranty under discussion must yield to the regulation in the interests of the public welfare. The measure being reasonable and in no manner arbitrary or oppressive, we conclude that it does not offend the constitutional guaranty.

## B. PLAINTIFF'S CLAIM THAT THE LEGISLATION IS IN CONFLICT WITH STATE LAW AND THUS UNCONSTITUTIONAL.

Under this heading fall the claims by the plaintiff that the ordinance is (1) in conflict with **Section 3, Article XVIII of the Ohio Constitution** in that the State has not delegated to municipalities the power to pass legislation concerning public health; (2) The Ordinance is Void as Authorizing a Public Utility to Practice Medicine, Dentistry and Pharmacy; (3) The Ordinance is Void as being in Conflict with General Laws Prohibiting the Adulteration of Food. We shall analyze each claim separately in the order stated.

### 1. Has the State Delegated to Municipalities the Power to Pass Legislation Concerning Public Health?

Plaintiff asserts that the State has not; that such legislation is the sole concern of the State; that such legislation is in conflict with the Ohio Constitution and the General laws of the state. Plaintiff cites **Section 3, Article XVIII of the Ohio Constitution,** and the statutory provisions providing for a State Board of Health and its power and duties, to-wit: **Secs. 1237, 1238, 1252-1 GC;** the statutory provisions providing for a City Board of Health and its powers and duties, to-wit: **§4404 and §4413 GC.**

Plaintiff argues that:

"From a cursory examination of the statutes above set forth, it is evident that the State Board of Health, vested with the broad powers of 'supervision of all matters relating to the preservation of the life and health of the people,' designates the state as supreme in the field of public health. The Supreme Court of Ohio, from 1912 to the present time, has held the State supreme in matters relating to public health as will appear from the following cases."

He quotes liberally from pages 24 and 25 of the case of **State Board of Health v. City of Greenville, 86 Oh St 1,** as depicting the general rules applicable to health legislation and represents that these rules have been followed by the Court down to the present day, citing as examples **State ex rel. Merydith Construction Co. v. Dean, Auditor, 95 Oh St 108 (1916); The Lorain Street R. Co. v. Public Utilities Com. of Ohio, 113 Oh St 68 (1925); City of Bucyrus v. State Dept. of Health, 120 Oh St**

426 (1929); State ex rel. Mowrer v. Underwood, 137 Oh St 1 (1940); Taylor v. City of Cleveland, 87 Oh Ap 132 (Cuy. County 1950). It is claimed that from an examination of the Constitution, the statutes and the cited cases that the municipality has no power to pass any ordinance in this field, the State being supreme in this respect.

In Ohio, the subject of public health is held to be a matter of statewide concern, and enactments of the General Assembly on that subject prevail over local enactments when the latter are in conflict therewith. **State ex rel. Mowrer v. Underwood, 137 Oh St 1 (1940).** The City of Cleveland is invested with powers of local self-government under the Constitution. **Article XVIII, Sections 3 and 7.**

The General Assembly was quick to override the decision in the Mowrer case to the extent of permitting Charter Cities, such as the City of Cleveland, to retain their own form of health organization. 119 Ohio Laws 551 (1941). **Sec. 4404 GC** specifically recognizes this proposition and by its terms provides for the establishment of Boards of Health in cities not governed by local City Charters. Cleveland has no Board of Health.

It follows that municipal ordinances having to do with public health which are free from conflict with the state general law are valid exercises of the powers of self-government.

The case of State Board of Health v. City of Greenville, supra, cited by plaintiff is not contra. At the time it was decided—April 2, 1912—municipalities had no Home Rule power. Moreover, the case presented no question of conflict or inconsistency between state and local law or regulation; the State now as then has plenary authority to require municipalities to treat sewage and purify the water supply and protect streams against pollution, but this case presents no problem respecting sewage treatment or stream pollution, and it is acknowledged in the agreed statement of fact herein, that no question of purification of the water supply is in issue.

Plaintiff by way of reply brief stresses the importance of the case of City of Bucyrus v. State Department of Health, supra, decided in 1929, after the adoption of the "Home Rule" amendment as supportive of this position. The Bucyrus case involved a question of a conflict by the City of Bucyrus with specific statutory provisions dealing with the subject of sanitation. The Court does "adhere to the decision of this Court in the case of State Board of Health v. Greenville, supra, and holds that the adoption of **Article XVIII of the Ohio Constitution** in no way impairs or affects the application of the law there announced to the present status of the State, the present

status of the State Board of Health, and the present status of municipalities in respect to sanitation." But the Court does recognize the principle that municipalities do have the power to enact public health legislation not in conflict with state general law.

There remains for disposition but one further question raised by plaintiff under this heading. It is found in his contention that "no evidence was presented of any approval by the State Department of Health of the program of fluoridation for the city of Cleveland, and that the journal of the Director of Health shows no such approval of the fluoridation of the Cleveland Water Supply."

The evidence shows—that the municipality in this case, has the open and avowed approval of the State Department of Health in adding fluorides to the water supply as a public health measure tending to reduce the incidence of dental caries. Before giving its approval, according to Dr. Porterfield's testimony, the State assured itself that Cleveland has both the facilities and the knowhow to effectuate a safe, successful and carefully executed program of fluoridation.

Upon examination of the pertinent provisions of the General Code it is the conclusion of the Court that since no specific executive order of the Director of Health was required in the instant case, no formal entry upon the Director's Journal is necessary. It is the further conclusion of the Court that the municipality and the Director of Health have fully complied with applicable law.

### 2. Does the Ordinance Authorize a Public Utility to Practice Medicine, Dentistry or Pharmacy?

Plaintiff devotes a considerable part of his briefs to a citation of the Constitution, Sections of the General Code and decided cases and arguments to support his contention that the ordinances under attack are void as being in conflict with the law of Ohio relating to the practice of medicine, dentistry, and pharmacy. Specific citations are **Article XVIII, Sec. 3 of the Ohio Constitution;** §1286 GC, defining the practice of medicine, surgery or midwifery; §12694 GC, penalty section; §1329 GC, defining the practice of dentistry; §1329-1 GC, making it unlawful to do so under a corporate name; §12714 GC, penalty provisions; §12706 GC, penalty for unlawfully selling drugs; §1296-1 GC, definition of terms.

Plaintiff argues that it is evident that any person would be prohibited from treating the teeth of any individual with fluoride chemicals as a preventive therapeutic agent, therefore can the City of Cleveland do it?

Although plaintiff has been at great pains to demonstrate

that a municipality is in no better position than would be an individual who would attempt to practice medicine, dentistry or pharmacy and has collated an extensive group of authorities to establish his position, it requires nothing more than a cursory reading of the statutes to establish that a municipal corporation, whether exercising its proprietary or governmental function, may not practice medicine or dentistry or pharmacy.

The basic question for determination under this heading is whether the addition of inorganic fluoride chemicals to the water supply of the City of Cleveland constitutes the practice of any of these professions.

The plaintiff assumes that it does, but his briefs do not contain any citation of decided cases to aid the Court in this regard, except the statutory provisions of §1286 GC as to who shall be regarded as practicing medicine, etc., §1329 GC same as to dentistry, and §12706 GC as to sale of drugs.

It has been said that the words "practice of medicine as used in the General Laws * * *, requiring authority to practice medicine, must be construed to relate to the practice of medicine as ordinarily and popularly understood." See State v. Hefferman, 65 A. 284, 287; 28 R. I. 20.

The practice of medicine has been said to mean, in its broadest sense, the practice of the art of healing disease and preserving health. Another definition is the treatment of human beings by another person for the purpose of relieving an ailment, with a public profession on the alleged doctor's part of the ability to cure and heal. Diagnosis of the patient's symptoms to determine what disease or infirmity he is afflicted with, and then to determine and prescribe the remedy or treatment to be used in attempting to cure him, have been said to be necessary elements of the practice of medicine or surgery. See 41 Amer. Juris., p. 151, Sec. 24. See also **Vol. 31 O. Jur., p. 349, Sec. 2,** and **Sec. 111, pages 411-412.**

The definitions stated are the ordinary and popular understanding of the term practice of medicine. These definitions when analyzed presuppose the existence of a personal relationship of physician and patient between two persons; a public profession that one has the ability to cure and heal, or a holding out of some such ability. It can scarcely be said that a municipality by adding inorganic chemicals to a public water supply designed to prevent or retard tooth decay by building up a resistance to such disease in all children in executing the provisions of a public health measure is practicing medicine.

The principles applicable to the practice of medicine with

slight variation are equally applicable to the practice of dentistry. Our own Court of Appeals in **Noble v. State, 44 Oh App p. 10,** at **page 12** says:

"While it is true that §1329 GC, enumerates certain operations and treatments that constitute dentistry, for which a license is required, yet the diagnosis of the needs of the patient is a presumed condition precedent to any operation or treatment." See also **31 O. Jur., page 413—Sec. 112.**

What has been said with respect to the necessity of personal relationship in practice of medicine is likewise true of the practice of dentistry. It is obvious that such does not exist in this case.

As to the claim that the municipality is engaged in the practice of pharmacy, it will suffice to refer to the definition of the term stated in Vol. 33, Words and Phrases, at page 222, under the heading "Practice of Pharmacy" wherein it is said:

"By Laws 1893, pg. 1552, regulating the practice of pharmacy, the phrase 'practice of pharmacy' means the compounding of prescriptions or of any United States pharmacopoeial preparation, or of any drug or poison to be used as medicines, or the retailing of any drug or poison, save as provided in the statute." Suffolk County v. Shaw, 47 N. Y. S., 347-350, 21 App. Div. 146.

It is the opinion of this Court that the addition of inorganic chemicals to a public water supply does not constitute the practice of pharmacy within the meaning of the statute.

### 3. Is the Ordinance in Conflict with General Law Prohibiting the Adulteration of Food?

It is plaintiff's contention that the addition of fluoride chemicals to the water supply of the City of Cleveland, being a food, runs afoul of the provisions of general law of Ohio prohibiting the adulteration of food, etc., the statutes in question being §§5774, 5775, 5778 GC and Section 3.3524 of the Municipal Code.

Sec. 5778 GC provides:

"Food, drink, confectionery or condiments are adulterated within the meaning of this chapter (1) if any substance or substances have been mixed with it, so as to lower or depreciate or injuriously affect its quality, strength or purity; * * * (7) if it contains any added substance or ingredient which is poisonous or injurious to health * * *."

The further question raised by plaintiff as to whether the City of Cleveland is bound by the provisions of general law was disposed of in our discussion of the preceding subdivision of plaintiff's claims.

In the agreed statement of facts to which plaintiff is a party, it is said as No. 11, "The said inorganic fluoride chemicals

to be introduced into the drinking water of the City of Cleveland will not, and are not intended to, have any effect on the potability, palatability or purity of the drinking water."

It is difficult to reconcile plaintiff's acquiescence in the foregoing agreement of fact No. 11 and his claim that the addition of fluorides violates the adulteration statutes. Moreover, the evidence in this case more than preponderates against the plaintiff's contention that fluorides at one part per million will have any deleterious effects upon the health of those ingesting such water.

Assuming, as we must, for the purpose of this action, that water is a food and that the sections of the General Code are applicable, we must conclude that by virtue of both the agreed statement of fact as well as the evidence that plaintiff's position relative to this phase of the case is untenable.

With respect to Section 3.3524 of the Municipal Code of Cleveland, it is obvious that such section relates to soft drinks commercially vended. However, assuming for the purpose of this question that it relates to the drinking water supply of Cleveland, this section of the Municipal Code is a creature of the legislative body of the City of Cleveland, which has the power and prerogative to repeal all or any part of such ordinance, either expressly or by implication. The legislation complained of being a later enactment would supersede the cited section of the Municipal Code.

The Court therefore concludes that the legislation in question in no manner violates the Constitutional provisions, or the General Laws of Ohio as claimed by the plaintiff under this heading and as a consequence the legislation is held to be a valid constitutional enactment by the legislative body of the municipality.

There remains for consideration the final, or eighth claim of the plaintiff which is set apart as the third group of plaintiff's contentions in the original grouping outlined by the Court. It is—

## C. THE ORDINANCES ARE VOID AS BEING BEYOND THE POWER GRANTED BY THE CONSTITUTION OF OHIO AND THE LAWS OF OHIO.

Since it is agreed that the addition of inorganic fluoride chemicals to the water supply of the City of Cleveland will not, and are not intended to have any effect on the potability and palatability or purity of the drinking water of the City of Cleveland, it is the contention of the plaintiff that the sole duty of the City of Cleveland in the operation of its water supply system is to provide the user of the water supply with pure, potable and palatable water; that since the addition

of fluoride chemicals has no effect on the palatability, potability or purity of the water, the Director of Public Utilities cannot be authorized to enter into and cannot enter into any contracts for the addition of fluoride chemicals to the water supply system.

Plaintiff cites as authority for such contention the pertinent part of **Article XVIII, Sec. 4 of the Ohio Constitution; §3961 GC**; McQuillin on Municipal Corporations, Sec. 3916; the case of Hayes v. Torrington Water Co., 88 Conn. 609, 92 A. 406 (1914) and McQuillin, supra, Sec. 35.32.

From these authorities, plaintiff argues that it is evident that the duty, object and purpose of the city in operating a water supply system is to furnish the users of the system pure, potable and palatable water, and can only enter into those contracts which would carry out these objectives.

Plaintiff places considerable emphasis and importance upon what he claims to be the leading case on this question, which is **The Travelers' Ins. Co. v. Village of Wadsworth, 109 Oh St 440 (1924).**

The evidence in this case is all to the effect that the addition of fluorides to the water supply in the proportion of one part per million is an accredited, preventive health measure and that it has the sanction of the state health department. It has been demonstrated herein that no law of the state forbids the city from adopting the program as a public health measure; that the city has ample power under the Constitution, the applicable statutes and its own Charter to undertake such a program. All three sources assure to the city the power to contract for municipal purposes.

Director Crown derives his authority not from **§3961 GC**, but from Section 111 of the Charter of Cleveland and the ordinances enacted in pursuance thereof. Even if this were not so, there is ample authority in **§3961 GC** for the contracts in question when the same have been authorized and directed by Council as a public health measure. In such a situation, the Director of Public Utilities is simply the administrative agent for the effectuation of the legislative will respecting a public health measure. **Sec. 3961 GC**, cited above adds nothing to the power vested in the city by **Section 4, Article XVIII of the Constitution of the State of Ohio.**

The case of Travelers' Insurance Company v. Village of Wadsworth, supra, does no more than to hold that an Ohio municipality having power under the Constitution to establish and maintain a public utility has power to contract for an insurance policy or indemnity against liability for the operation. It is difficult to see the applicability of that decision to the instant case if any exists.

The case of Hayes v. Torrington Water Company, supra, is equally remote from any point at issue in the instant case. Giving the decision its fullest scope it may be considered as authority for the proposition that a municipality, like a private water company, may be liable in tort for injuries resulting from negligence in furnishing germ laden water. The evidence in this case indicates no likelihood that personal injury will result from the consumption of fluoridated water.

Plaintiff's quotation from McQuillin's Municipal Corporations, Section 35.43 is equally inappropriate in the instant case. However correct the text may be as a general statement of the power of a city owning and operating a water works to contract with reference thereto, it cannot in the nature of things be a measure of the authority of the city to enter into contracts in pursuance of its constitutional power to own and operate a water works. In any event, when the Council ordains that the water supply be fluoridated and when its action is unimpeachable on any asserted legal ground, there can be no doubt of the authority of the City to make contracts appropriate to the execution of the legislative mandate.

## CONCLUSIONS.

Based upon the evidence and the law as heretofore stated the Court reaches the conclusion

1. That the rights claimed by plaintiff as constitutional guarantees, namely (1) the right to the personal liberty to treat his health as he deems best; (2) the right of parents to their personal liberty to rear and care for their children as they deem best; (3) the right to be free from medical experimentation on his person and (4) the right to freedom of religion, are such that must yield to a public health measure determined to be necessary and adopted for the common good and welfare of the public, or a substantial segment thereof by the municipal legislature pursuant to a lawful exercise of the police power of such political subdivision, and such health measure bears a real, substantial and reasonable relation to peace, safety, health, morals and best interests of the public and is not exercised in an arbitrary and oppressive manner;

2. That the legislation herein involved is a public health measure and does bear a real, substantial and reasonable relation to the dental health of the City of Cleveland and the community served by Cleveland public water supply;

3. That the wisdom of such legislation, the extent of the threatened danger; and the efficacy of the remedy are political questions and the Court may not determine in the first instance whether such measure is or is not the best mode of protecting the public health by substituting its judgment for that of the legislative body;

4. That the validity of such legislation does not depend upon the existence of some emergency, overriding public necessity, public self defense, or epidemic, but is a lawful public health measure when determined to be necessary by a public legislative body and such legislation so adopted bears a real, reasonable and substantial relation to its objects;

5. That the record in this case discloses conclusively that the Cleveland City Council adopted this legislation after substantial public hearings; that it was wholly familiar with the contentions of both the proponents and the opponents and had ample opportunity to weigh the evidence and determine the advisability and wisdom of the proposed program and as a consequencec did not abuse its discretion in its favorable action upon the passage of the legislation;

6. That such City Council in enacting this legislation declaring its necessity as a public health measure did not act in an arbitrary manner, and though the subject of fluoridation of public drinking waters is not free from controversy, the program adopted, to fluoridate public water at one part per million parts is not oppressive, arbitrary or dangerous so as to warrant the intervention of this Court;

7. That the City of Cleveland by the terms and provisions of the Ohio Constitution, the general laws of the state and provisions of its City Charter is empowered and authorized to enact legislation concerning public health, providing such legislation is not in conflict with the general law of the state, and that the instant legislation is in all respects consistent with general law and not in conflict therewith;

8. That the addition to the public water supply of inorganic chemicals, sodium fluoride, by the City of Cleveland as a therapeutic agent for the prevention of caries does not constitute the practice of medicine, dentistry or pharmacy within the meaning or spirit of the provisions of the General Code of Ohio prohibiting such practice by persons or corporations unless qualified under the statutes;

9. That the addition to the public water supply of inorganic chemicals, sodium fluoride, by the City of Cleveland does not constitute the adulteration of food, in fact or in law, within the meaning of the provisions of the General Code of Ohio, or the Municipal Code of Cleveland;

10. That the ordinance providing for fluoridation is a valid and lawful enactment of the legislative body of the City of Cleveland, enacted by such body pursuant to the power vested in such municipality by the Constitution of the State of Ohio, the general laws of the state and the provisions of its City Charter;

11. That the resolutions adopted by its Board of Control and the contracts entered into by the Director of Public Utilities for the purpose of facilitating the fluoridation program pursuant thereto, and the contracts proposed for such purpose are actions within the lawful power and authority of such municipality;

12. That the expenditure of public funds for such purpose is an expenditure of public funds within the lawful power and authority of such municipality;

13. That the legislation sought to be enjoined is a constitutional enactment, consistent with general laws of the state and lawfully within the Charter of the City of Cleveland;

14. That the plaintiff has failed to establish, by the requisite degree of proof, his right to the relief prayed for and his prayer for such relief is therefore denied and the petition will be dismissed at his costs.

An appropriate journal entry in conformance herewith shall be prepared by prevailing party.