THOMAS LOOKUP EVANS, Plaintiff in Error, *v.* THE PEOPLE OF THE STATE OF NEW YORK, Defendants in Error.

The willful killing of an unborn child is not manslaughter except as made so by statute.

To constitute the crime of manslaughter, created by chap. 631 of the Laws of 1869, in causing the death of an unborn child by an attempt to produce a miscarriage, the quickening of the child in the mother's womb must be averred and proved. The child is not the subject of manslaughter under the statute until it has "quickened."

Under an indictment, therefore, charging the accused with causing the death of the child, there can be no conviction of an attempt to commit the offence without proof that the child was "quick" at the time of the commission of the wrongful acts with intent to produce the miscarriage. (GROVER, J., dissenting.)

(Argued March 1st, 1872; decided April 2d, 1872.)

ERROR to the General Term of the Supreme Court in the first judicial department, to review judgment of that court, affirming a judgment of the Court of General Sessions of the Peace in and for the city and county of New York, convicting plaintiff in error of an assault upon the person of Ann O'Neill, with intent to commit manslaughter in the second degree.

The substance of the indictment and the facts proved are set forth in the prevailing opinion.

The questions as to the admission of evidence, discussed in the dissenting opinion, not having been passed upon by the court, are omitted.

*Samuel Hand* for plaintiff in error. The procuring or the attempt to procure miscarriage of a child not quick is not a crime. (*State* v. *Cooper*, 2 Zabriskie, 52; *Comm.* v. *Parker*, 9 *Metc.*, 263; *Comm.* v. *Bangs*, 1 *Mass.*, 387.) The name of a party whose existence is essential to a charge must be proved as laid in the indictment; a variance is fatal. (1 Bisp. Crim. Pro., § 119; 1 Chitty, C. L., 216; *State* v. *Waters*, 3 Brev., 507; 1 East, P. C., 514; 2 Leach, 774; 1 id., 252, 286, 351, 370; 1 East, P. C., 415, 651; Barb. C. Law, 329; Ryan and M. C. C., 1; 2 East, P. C., 593; 1 Stark. Ev., 470; *Rex* v. *Kelly*, Carr. Sup., 42; Arch. C. P., vol. 1, 124.) A party is bound by the answer of his opponent's witness upon collateral matter drawn out upon cross-examination, and cannot contradict him. (*Carpenter* v. *Ward*, 30 N. Y., 243; *Newcomb* v. *Griswold*, 24 id., 299; *Lawrence* v. *Barker*, 5 Wend., 301; *Harris* v. *Nelson*, 7 id., 57; *Howard* v. *City Fire Ins. Co.*, 4 Denio, 50; *Stephens* v. *The People*, 19 N. Y., 572.)

*Algernon S. Sullivan* for defendants in error.

ALLEN, J. The accused was indicted for the statutory offence of manslaughter in the second degree, created and defined by chap. 631 of the Laws of 1869, entitled "An act relating to the procurement of abortions, and other like offences." He was charged with having, by acts and means mentioned in the first section of the act, caused and procured the miscarriage of one Ann O'Neill, then being pregnant with child, by which the death of the child was produced. The prosecution failed to prove that a miscarriage was effected, or that the death of the child was caused or produced by the

act or agency of the prisoner. The pregnancy of the female was proved and that she was prematurely delivered of two living children, and evidence was given tending to prove that the prisoner had some time before the birth of the children furnished the mother with medicines, to be taken by her, and had also applied instruments to her person for the avowed purpose of procuring a miscarriage.

The act distinguishes, as the prior legislation of the State has distinguished, between the actual accomplishment of an abortion, resulting in the death of the mother or child, and the ineffectual attempt or the furnishing of means to effect a miscarriage, making the latter offence a misdemeanor and the former a felony.

The first section of the act makes the administering of medicines or the use of other means, with intent to produce a miscarriage, resulting in death, manslaughter in the second degree. It is the intent with which the act is committed that, in the case of the death of the female, reduces the crime from murder to manslaughter; for if the same acts are committed and the same means resorted to with intent to accomplish her death, and the death ensues, it is murder. Causing the death of an infant in the mother's womb was at a very early day deemed murder; but is not so regarded at the common law at the present time, and is not made so by statute. Such an infant is not considered a person or a human being, upon whom the crime of murder can be committed. (1 Russ. on Crimes, 485, 671.) At common law, an unsuccessful attempt to effect the destruction of an infant, "quick" in its mother's womb, appears to have been treated as a misdemeanor, and an actual destruction of such infant as a high crime. (1 Russ. on Crimes, 671; *Commonwealth* v. *Bangs*, 9 Mass., 387; *Same* v. *Parker*, 9 Metc., 263.)

The willful killing of an unborn child is not manslaughter, except as rendered so by statute. The general laws of the State make the killing of a quick child manslaughter in the first degree when caused by an injury to the mother, which would be murder if it resulted in the death of the mother.

(1 R. S., 661, § 8.)   And by the act under consideration, it is made manslaughter in the second degree to cause the death of the child in an attempt to procure a miscarriage.

The indictment does not charge that the child or children with which Ann O'Neill was pregnant, had, at the time of the alleged offence, quickened in the womb.   In other words, it is not charged that she was pregnant with a quick child, and there was no evidence that the child had quickened. The judge, in response to an inquiry by the prisoner, charged that it was immaterial whether the child was then quick, and that it was enough that she was pregnant; and that an abortion, in any stage of pregnancy, was manslaughter in the second degree.

A woman is "quick with child" from the period of conception and the commencement of gestation, but is only "pregnant with a quick child" when the child has become quickened in the womb. (*Regina* v. *Wycherley*, 8 C. & P., 262.) It was assumed by the judge and the conviction was had upon the theory that the offence, under the statute, would be consummated by the destruction of the fœtus at any time during pregnancy.

A miscarriage can be effected at any time after actual conception; and if the death of the woman results from an attempt to produce it by any of the acts and means mentioned in the statute, the offence is complete.

There was no evidence given upon the trial as to the commencement of life in the child or the character or degree of vitality at the different periods of gestation.   But it may be assumed that the claim of the physiologist is true, that life exists from the first moment of conception.   And it has been well settled, from a very early period, that certain civil rights attach to the child from the first, and that legal consequences result from pregnancy before actual quickening.   (1 Bl. Com., 129.)   But it is life in embryo, and recognized in the interests of humanity in some cases, and in others in the interest of the child thereafter to be born, and in respect to succession of estates.

But until the period of quickening there is no evidence of life; and whatever may be said of the fœtus, the law has fixed upon this period of gestation as the time when the child is endowed with life, and for the reason that the fœtal movements are the first clearly marked and well defined evidences of life. (Dean's Med. Jur., 129.)

Although there may be life before quickening, all the authorities agree that a child is not "quick" until the mother has felt the child alive within her. "Quick" is synonymous with "living," and both are the opposite of "dead." The woman is not pregnant with a living child until the child has become quick. If the child is a living child from the instant of conception, then all the authorities, medical and legal, are sadly at fault in their attempts to distinguish between mere pregnancy and pregnancy with a quick child, and legislators have been laboring under the same hallucination in legislating upon the subject, for all the acts passed in reference to abortion in this country and in England recognize the fact that the child does "quicken," that is, become endowed with life, at a certain period, longer or shorter, after conception, and that there is a period during gestation when, although there may be embryo life in the fœtus, there is no living child. (1 Russ on Crimes, 672; Am. Cr. Law, § 1214 and *seq.*)

Death is the opposite of life; it is the termination of life, and death cannot be caused when there is no life. There must be a living child before its death can be produced. It is not the destruction of the fœtus, the interruption of that process by which the human race is propagated and continued, that is punished by the statute as manslaughter, but it is the causing the death of a living child.

Blackstone says, life begins, in contemplation of law, as soon as an infant is able to stir in the mother's womb. (1 Bl. Com., 129.) It ceases at death. (*Commonwealth* v. *Parker*, 9 Met., 263; *State* v. *Cooper*, 2 Zab. [22 N. J.], 52.) The distinction is not only recognized but distinctly affirmed in the cases in which convictions for causing the miscarriage of a woman, before the child has quickened, have been sus-

tained, and the convictions have been for offences clearly distinguishable from the statutory offence of manslaughter created by the act of 1869. *Mills* v. *Commonwealth* (13 Penn. St. R., 631) was a conviction for an attempt to procure abortion, and there was no averment that the child had quickened, and it was held that such averment was unnecessary. The judge said it was not the murder of a living being that constituted the offence, but the destruction of gestation by wicked means and against nature. He speaks of the womb as "instinct with embryo life" after gestation has begun, but recognizes the fact that there is no living child who can be killed, whose life can be taken from it, until the period of quickening. It was error to charge that the death of a child could be caused or produced before it had given evidence of life, had become "quick" in the womb, and that the crime of manslaughter under the statute could be predicated of the destruction of the fœtus before that period.

For this error of the court the judgment of the Supreme Court and of the Sessions should be reversed and a new trial granted.

GROVER, J. (dissenting). The circular was properly received in evidence. The testimony authorized the jury to presume that the defendant had received the envelope, placed by the witness in the post-office, directed to him. (1 Greenleaf's Evidence, § 40.) This envelope inclosed the one in which the circular was received, and which the witness had inclosed addressed to herself in the one addressed to the defendant before mailing the latter. The presumption being that the envelope inclosing the circular was received by the defendant, and this envelope having been mailed to the witness with the circular inclosed therein, the jury were authorized further to presume that this was done by the defendant or under his authority. Besides, the witness, after the circular was received in evidence, testified that in a conversation with the defendant at his office, after she received the circular, she spoke of having received it, and that she was thereby induced to come

there, to which the defendant made no reply. This was in effect an admission of the defendant that he had sent the circular to the witness, and would constitute a complete answer to the exception, even if well taken at the time the circular was received in evidence. There was no fatal misnomer in the indictment. The evidence showed that the prosecutrix, at the time the indictment was found, and for some time prior thereto, had adopted the name of Ann O'Neill, and was known by that name only by the persons where she had been living. This identified the person intended with entire certainty, and fully protected the defendant against the danger of another prosecution founded upon the same transaction. The testimony of Youngblood was competent. The defendant had testified that, while in custody upon this charge, he had been called upon by a person who had informed him in substance that the matter could be settled upon the payment by him of a large sum of money. Upon cross-examination, he testified that Youngblood was the person who made such a proposition. Whether any person connected with the prosecution had made attempts to extort money from the defendant was not a question immaterial to the issue. While it did not bear directly upon the question of his guilt or innocence, it did so indirectly by its effect upon the credibility of the witnesses introduced in support of the prosecution. It was proper, therefore, to repel this effect by his testimony, and this was done by showing by him that he had never made any such proposition to the defendant. The judge was right in not receiving the verdict first presented by the jury. That was defective, and no judgment could have been given thereon. It was therefore proper to send the jury out for further deliberation, under proper instructions as to the verdict necessary to a final determination of the case. The judge correctly held, that the defendant could be legally convicted upon the indictment of an attempt to commit the offence charged therein, in case the evidence showed that he had made such attempt, and that he had failed to perpetrate the crime. (2 R. S.,

§§ 27, 702.) This brings us to the important question in the case. That is, whether the evidence authorized the conviction of the defendant of an attempt to commit the crime charged in the indictment. That crime was manslaughter in the second degree, charged to have been committed by a violation of section 1, of chapter 631, volume 2, 1502, Laws of 1869, which provides that any person who shall administer to any woman with child, or prescribe for any such woman, or advise or procure her to take any medicine, drug, substance or thing whatever, or shall use or employ any instrument or other means whatever, with intent thereby to produce the miscarriage of any such woman, unless the same shall have been necessary to preserve her life, shall, in case the death of such child or of such woman be thereby produced, be deemed guilty of manslaughter in the second degree. Under this section, it is entirely clear that a person guilty of the commission of the acts thereby prohibited, which result in the death of the woman, or of a quick child of which she is pregnant, may be convicted of manslaughter in the second degree. It is equally clear that a person committing such acts with the intent to produce the miscarriage of a woman pregnant with a quick child, and thereby cause its death, may be convicted of an attempt to commit such offence, although the acts may fail to produce the effect intended, that is, the miscarriage of such woman, and are not followed by the death of either the mother or the child. The word miscarriage is used in the statute to designate a premature delivery, including such where it is impossible for the young to survive; although the word may, also, include cases where there is such a probability. The evident intention of the section is to prevent all attempts to produce the miscarriage of a pregnant woman, unless such miscarriage is necessary to the preservation of her life. It will be observed that the section is silent as to any intention of producing the death of the woman or of the child. If the acts were perpetrated with intent to effect the death of the woman and produced that result, the crime would be murder

under another statute; but such acts are rarely, if ever, so committed. But as a miscarriage, as the word is used in the statute, almost invariably, if not always, produces the death of the child, it follows that acts done with intent to produce such miscarriage are also done with intent to produce the death of the child; and that as an attempt to produce the former includes an attempt to produce the death of the latter, it follows that an attempt to produce the miscarriage of a woman pregnant with a child whose life is within the protection of the section under consideration, renders the party guilty liable to conviction of an attempt to commit manslaughter in the second degree. But, in the present case, although there was evidence tending to show that Ann O'Neill was at the time pregnant with a quick child, yet this fact was not conclusively proved, but was a question proper for the determination of the jury; and the judge having in effect charged the jury that such question was immaterial, and that the defendant might be convicted of an attempt to commit the crime whether such child was quick or not. The question for the determination of the court, is whether the conviction was proper, upon the assumption that such child was not quick. At common law such an attempt, though successful, was not an offence punishable in any way if done with the assent of the woman. (*Commonwealth* v. *Parker*, 9 Metcalf, 263 and authorities cited.) Life, says Blackstone (1 Com., 129), is the immediate gift of God; a right inherent by nature in every individual; and it begins, in contemplation of law, as soon as an infant is able to stir in its mother's womb; and then proceeds to show that the unlawful destruction of such a child was a crime at common law. It thus appears that at common law a child, before quickening, was not considered a living being, and, consequently, no safeguards for its life were provided. The question is whether this is so under the statute, or whether a child, before quickening, is not within its protection. In determining this question it is proper to look not only to the common law but to previous statutes relating to the sub-

ject.   In 1845 (Gen. Laws, p. 285) an act was passed, by the first section of which any person who should administer, etc., to any woman pregnant with a quick child, with intent to destroy such child, was made guilty of manslaughter in the second degree, irrespective of whether such child was thereby destroyed or not.   Section 2 of the act made the administering, etc., to any pregnant woman, with intent thereby to produce the miscarriage of such woman, a misdemeanor punishable by fine and imprisonment.   The cases provided for in this section were those where the child had not quickened. Thus, both classes were provided for.   The offence of destroying a child before quickening being less in degree than the destruction of one after that period.   In 1846 (Laws of that year, p. 19) an act was passed, making the administering to any woman pregnant with a quick child, etc., with intent to destroy such child, in case the death of such child or the mother was thereby produced, manslaughter in the second degree.   Section 2 of this act repeals section 1 of the act of 1845, but leaves section 22, the residue of the latter act, in full force.   It will be seen that all the alteration made in the act of 1845 by that of 1846, was the making the death of the mother or child essential to constitute the crime of manslaughter in the second degree.   This alteration shows clearly that the legislature regarded the law as authorizing a conviction for an attempt to commit the crime specified in section 1 of the act of 1846; otherwise the law, so amended, would leave an abortive attempt to destroy a quick child without any punishment; while a similar attempt to destroy one before arriving at that period was left subject to punishment under section 2 of the act of 1845.   This brings us to the act of 1869 (*supra*), upon section 1 of which the indictment in the present case is founded.   The language of this section is: Any person who shall administer, etc., to any woman with child, instead of pregnant with a quick child, as in section 1 of the act of 1845, and in the same section of the act of 1846. This change in phraseology clearly makes section 1 of the act of 1869 include cases not embraced in the same sections in

the acts of 1845 and 1846. The latter only include cases of pregnancy with a quick child. The former, by the language used, includes all cases of pregnancy, irrespective of the question whether the child had quickened or not; and clearly makes the death of a child before quickening, by the acts prohibited, constitute the crime of manslaughter in the second degree. The act of 1869 has destroyed all distinction in the offences, placing the destruction of a child before or after quickening upon the same footing. If any additional evidence was required to establish this, it will be found in sections 2 and 4 of the act of 1869. By the latter, section 2 of the act of 1845 and section 1 of the act of 1846 are repealed; they making the procuring of miscarriage, when the child had not quickened, absolutely free from punishment unless embraced in section 1 of the act; and all cases of unsuccessful attempts to procure a miscarriage, not followed by the death of the mother, free from punishment unless the guilty party may be convicted of an attempt to commit the offence specified in section 1 of the act. A construction of the act of 1869, producing such a result, would violate not only the plain meaning of the language used in section 1, but, also, the clear intention shown by the residue of the act. Section 2 of the act of 1869 creates a new offence relating to the same subject, making it a misdemeanor to supply any woman with medicine intended to be used for the purpose of procuring a miscarriage, whether such woman be pregnant or not; thus showing a design to increase the safeguards against this offence instead of relaxing them. Unless a party who administers medicine to a pregnant woman or uses an instrument or other means with intent to procure her miscarriage, and thereby destroy the child, may be convicted of the attempt to commit the crime under the first section, although neither the death of the woman or child is thereby produced, the strange anomaly would be presented that a party, so guilty, would be free from punishment while one supplying medicine to a woman, knowing that it was intended for such use, would be liable to punishment although such medicine was

never used, or, if used, produced no effect. My conclusion is that the defendant was rightly convicted of the attempt to commit manslaughter in the second degree. The judgment must be affirmed.

All concur for reversal except Grover, J., dissenting.

Judgment reversed.