OLLIE CHEANEY *v.* STATE OF INDIANA.

[No. 1171S321. Filed July 24, 1972. Rehearing denied October 20, 1972. Petition for Certiorari to United States Supreme Court denied March 27, 1973.]

*Rice & Vanstone,* of Evansville, for appellant.

*Theodore L. Sendak,* Attorney General, *Stephen J. Cuthbert,* Deputy Attorney General, for appellee.

HUNTER, J.—This is an appeal by Ollie Cheaney (Mae Owens), appellant (defendant below) from a conviction of abortion pursuant to IC 1971, 35-1-58-1 (Ind. Ann. Stat. § 10-105 [1956 Repl.]) hereinafter referred to as the Indiana Abortion Law. It reads as follows:

> "Whoever prescribes or administers to any pregnant woman, or to any woman whom he supposes to be pregnant, any drug, medicine or substance whatever, with intent thereby to procure the miscarriage of such woman, or, with like intent, uses or suggests, directs or advises the use of any instrument or means whatever, unless such miscarriage is necessary to preserve her life, shall, on conviction, if the woman miscarries, or dies in consequence thereof, be fined not less than one hundred dollars [$100] nor more than one thousand dollars [$1,000], and be imprisoned in the state prison not less than three [3] years nor more than fourteen [14] years."

Appellant entered a plea of not guilty and filed a Motion to Quash the affidavit which was overruled. The cause was tried to a jury and appellant was found guilty as charged. Appellant was sentenced to the Indiana Women's Prison for not less than three (3) years nor more than fourteen (14) years. A Motion to Correct Errors was overruled and this appeal followed. Appellant bases her entire appeal on the denial of the Motion to Quash having specifically waived any other alleged errors. Appellant claims the Motion to Quash should have been sustained because the Indiana Abortion Law is unconstitutional on three different grounds. First, it is claimed the law violates the Ninth Amendment to the United States Constitution in that it deprives a woman of her private decision whether to bear an unquickened fetus. Secondly, it is claimed that its enforcement denies equal protection to the poor. Third, it is claimed that the statute is unconstitutionally vague because of that part of the statute which reads "is necessary to preserve life."

I

Our initial concern is the State's challenge to appellant's standing to assert the claim that the law is an unconstitutional

denial of a woman's right to decide whether to bear an unquickened fetus. Admittedly it is the general rule that one may not attack a statute on constitutional grounds unless he is a member of class of people whose constitutional rights have been infringed upon. See *United States v. Raines* (1960), 362 U.S. 17. However, in *Griswold v. Connecticut* (1965), 381 U.S. 479, the executive and medical directors of a planned parenthood league who were convicted as accessories to the crime of using contraceptives were held to have standing to raise the constitutional rights of the married people with whom they had a professional relationship. The Court there stated:

> "Certainly the accessory should have standing to assert that the offense which he is charged with assisting is not, or cannot constitutionally be, a crime." 381 U.S. at 481.

Although we have separate statutes for the person performing the abortion and the person receiving the abortion, the relationship is substantially the same as that of principal and accessory. See also, *Eisenstadt v. Baird* (1972), 405 U.S. 438, 31 L. Ed. 2d 349; *Roe v. Wade* (N. D. Texas 1970), 314 F. Supp. 1217; *Doe v. Bolton* (N. D. Ga. 1970), 319 F. Supp. 1048; *Steinberg v. Brown* (N. D. Ohio 1970), 321 F. Supp. 741. There can really be no doubt about the existence of a case and controversy in this instance. We therefore hold that the appellant has standing to assert this claim and we reach the merits.

Appellant asserts that the Ninth Amendment provides a fundamental right to privacy which includes the woman's right to decide whether to bear an unquickened fetus, citing *Griswold v. Connecticut, supra,* and *Eisenstadt v. Baird, supra.* She also cites *Union Pacific Railway Co. v. Botsford* (1891), 141 U.S. 250, 251 wherein it is stated:

> "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all

restraint or interference of others, unless by clear and unquestionable authority of law."

Admitting that a certain right to privacy does exist, be it under the Ninth Amendment or emanating from a penumbra of the rights contained in the first nine amendments, the question becomes whether there is a compelling state interest in the regulation of this activity. A complete prohibition of abortions except to save the mother's life is no longer necessary to protect a woman's health as it has been demonstrated that an abortion, under proper medical care, during the early months of pregnancy is now safer than childbirth. See, Association for the Study of Abortions Newsletter Vol. VI Nos. 2-3 at 6 (Spring-Summer 1971); 23 Hastings L.J. 147 (1971). However, this is not the only interest of the State; the appellee contends protecting the life of the unborn child constitutes the basis for a compelling state interest. To make this determination we must decide whether the unborn child has an independent existence, and also whether this independent existence begins at conception or only at quickening. In doing so, we look to the legal recognition and the medical recognition of the fetus, both quickened and unquickened.

## A

Early in the common law of property, the courts recognized the property rights of an unborn child without regard to the state of gestation. See *Wallis* v. *Hodson* (Ch. 1740), 26 Eng. Rep. 472; *Marsh* v. *Kirby* (Ch. 1634), 21 Eng. Rep. 512; *Hale* v. *Hale* (Ch. 1692), 24 Eng. Rep. 25; *Burdet* v. *Hopegood* (Ch. 1718), 24 Eng. Rep. 484; *Doe* v. *Clark* (C.P. 1795), 126 Eng. Rep. 617. Blackstone stated:

"An infant *in* [sic] *ventre sa mere,* or in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a legacy, or a surrender of a copyhold estate, made to it. It may have a guardian assigned to it; and it is enabled to have an estate limited to its use, and to take

afterwards by such limitation, as if it were then actually born." W. Blackstone, Commentaries *130.

This led a New York court to conclude:

"It has been the uniform and unvarying decision of all common law courts in respect to estate matters for at least the past two hundred years that a child *en ventre sa mere* is 'born' and 'alive' for all purposes for his benefit." *In Re Holthausen's Will* (1941), 175 Misc. 1022, 1024, 26 N.Y.S. 2d 140, 143.

Indiana has followed this precedent. In *King* v. *Rea* (1877), 56 Ind. 1, it was held that a deed to the grantee "and her children, and their heirs and assigns forever" included children *en ventre sa mere* but excluded any other afterborn children. In *Biggs* v. *McCarty* (1882), 86 Ind. 352 there was a devise to devisee and her children; and, at the time of testator's death, the devisee was pregnant. It was held that the estate vested immediately such as to create a tenancy in common between the devisee and her unborn child to the exclusion of any afterborn children. An unborn child also receives rights without consideration of the time of quickening under our present Probate Code. IC 1971, 29-1-2-6 (Ind. Ann. Stat. § 6-206 [1953 Repl.]) reads:

"Descendants of the intestate, begotten before his death but born thereafter, shall inherit as if they had been born in the lifetime of the intestate and had survived him. With this exception, the descent and distribution of intestate estates shall be determined by the relationships existing at the time of the death of the intestate."

B

In the field of torts, it was held for many years that the unborn child was part of the mother and no recovery was allowed for the injury to the unborn child. The leading case was *Dietrich* v. *Inhabitants of Northampton* (1884), 138 Mass. 14. However as we gained more knowledge medically, legal attitudes started changing. The

first case recognizing a right of recovery in such a case was *Bonbrest* v. *Kotz* (D.D.C. 1946), 65 F. Supp. 138. A right of recovery for injuries to the unborn child is now allowed in a majority of the states. See Note, 46 Notre Dame Lawyer 349, 356 n. 59 (1971). Recently the Court of Appeals of Indiana held that a father could maintain an action for the wrongful death of a stillborn child. See *Britt* v. *Sears* (1971), 150 Ind. App. 487, 277 N. E. 2d 20. It was stated by Professor Prosser:

> "All writters who have discussed the problem have joined in condemning the old rule, in maintaining that the unborn child in the path of an automobile is as much a person in the street as the mother, and in urging that recovery should be allowed upon proper proof." Prosser, *Law of Torts*, § 55 at 336 (4th ed. 1971).

However, many of the cases cling to a viability distinction whereby recovery is allowed only if the unborn child is viable. This appears to be a carryover from the old common law. For instance, under common law, abortion could be a crime only after the unborn child had quickened. See *Smith* v. *Gaffard* (1857), 31 Ala. 45; *Abrams* v. *Foshee* (1856), 3 Iowa 274; *Smith* v. *State* (1851), 33 Me. 48. It would seem the reason for using this distinction was that it provided a short-hand method for the common law to establish the point in time when the unborn child first became a living being. Since quickening was the first time the mother felt movement, it was used to represent the first manifestations of life separate and distinct from the mother. See *Evans* v. *People* (1872), 49 N. Y. 86. It appears therefore that the distinction was based on the extent of the medical knowledge at the time. This idea is bolstered by the common law and statutory provisions that the execution of a woman sentenced to death must be postponed if she were both pregnant and quickened. Pregnancy alone was not enough, indicating a belief that only at the point of quickening was there a second life present. See, Louisell, Abortion, *The Practice of Medicine*

*and Due Process of Law,* 16 U.C.L.A. L. Rev. 233, 240 (1969) ; Note, 56 Iowa L. Rev. 994 (1971).

However, medical science has made great strides since that time and quickening can no longer be considered the point at which independent life begins. It is now established that some sort of independent life begins at conception. See Louisell, *supra,* at 247 n. 71. See generally, Halley and Harvey, *"The Beginning of Life,"* 69 J. Kans. Med. Soc. 384 (1968). One medical authority has said:

> "Biologically as well as ethically the only logical and satisfactory view of the embryo is to regard it as a human being from the outset. It has from the outset a degree of independence with regard to the mode of its growth and development and, though receiving nutrition from the mother, the manner of its development is not controlled by her." John Marshall, M. D. *Medicine and Morals* 66 (1964).

Another has stated:

> "[H]uman development is a single continuous process from implantation of the fertilized ovum in the uterine wall to the achievement of adult personhood." Dennis Cavanaugh, M.D., "Reforming the Abortion Laws," *America,* April 18, 1970, p. 409.

Because of our advances in medical knowledge a number of states have now rejected the viability distinction in allowing recovery for injuries to an unborn child. See, *Kelly* v. *Gregory* (1953), 282 App. Div. 542, 125 N. Y. S. 2d 696; *Sinkler* v. *Kneale* (1960), 401 Pa. 267, 164 A. 2d 93; *Torigian* v. *Watertown News Co.* (1967), 352 Mass 446, 225 N. E. 2d 926; *Smith* v. *Brennan* (1960), 31 N. J. 353, 157 A. 2d 497; *Puhl* v. *Milwaukee Automobile Ins. Co.* (1959), 8 Wis. 2d 343, 99 N. W. 2d 163; *Sylvia* v. *Gobeille* (1966), 101 R. I. 76, 220 A. 2d 222; *Bennett* v. *Hymers* (1958), 101 N. H. 483, 147 A. 2d 108. In *Kelly* v. *Gregory, supra,* the court said,

> "While the point at which the foetus becomes viable has been of usefulness in drawing some legal distinctions, the underlying problem that has usually troubled the Judges

who have written on the subject of recovery for prenatal injuries, has been in fixing the point of legal separability from the mother.

We ought to be safe in this respect in saying that legal separability should begin where there is biological separability. We know something more of the actual process of conception and foetal development now than when some of the common law cases were decided; and what we know makes it possible to demonstrate clearly that separability begins at conception." 282 App. Div. at 543-44, 125 N. Y. S. 2d at 697.

The Pennsylvania Court in *Sinkler* v. *Kneale, supra,* expressed a similar attitude:

"As for the notion that the child must have been viable when the injuries were received, which has claimed the attention of several states, we regard it as having little to do with the basic right to recover, when the foetus is regarded as having existence as a separate creature from the moment of conception." 401 Pa. at 273, 164 A. 2d at 96.

It is clear that the legal distinction of viability in the field of torts is losing acceptance as we gain more knowledge that biologically it is merely an *arbitrary* distinction.

## C

The unborn child has gained recognition in other areas of the law as well. In *Kyne* v. *Kyne* (1940), 38 Cal. App. 2d 122, 100 P. 2d 806, a father was forced to provide support for an unborn child. In *Raleigh Fitkin-Paul Morgan Mem. Hosp.* v. *Anderson* (1964), 42 N. J. 421, 201 A. 2d 537, cert. den. 377 U.S. 985, the court, as *parens patriae,* protected the life of an unborn child against the clearly fundamental right of the parent to freedom of religion when the court said a hospital could force both the unborn child and the mother to receive blood transfusions against the mother's wishes and religious convictions.

## D

While these developments fail to provide any ready solutions to the abortion problem they sufficiently illustrate the

existence of certain rights inhering in the unborn child independent of the mother, which the state may protect. The existence of the unborn child distinguishes this case from *Griswold* v. *Connecticut, supra,* or *Eisenstadt* v. *Baird, supra.* Those cases involved the right to receive contraceptives while this case involves abortion, the *fundamental distinction* being the difference *between prevention and destruction.*

When the rights of the unborn child come in conflict with the rights of the mother, the State can and must strike a balance between these interests. We do not pretend to know where the balance should lie for this involves a weighing of social values which is a legislative function and properly outside the ambit of the judiciary.

As Justice Holmes stated:

> "It is a misfortune if a judge reads his conscious or unconscious sympathy with one side or the other prematurely into the law, and forgets that what seem to him to be first principles are believed by half his fellow men to be wrong . . ." Holmes, Collected Legal Papers 295 (1920).

In *Rosen* v. *Louisiana State Board of Medical Examiners* (E. D. La. 1970), 318 F. Supp. 1217, a statute similar to the Indiana statute was upheld against a similar attack. It was there stated:

> "We may not, however, while professing to act in the service of humane ends, confound private notions with constitutional imperatives. Even where the social undesirability of a law is not disputed, and this is by no means such a case, invalidation of that law by a court debilitates popular democratic government." 318 F. Supp. at 1230.

We do not mean to imply by this opinion that other legitimate medical views do not exist on this issue (See, Symposium-Law, Morality, and Abortion, 22 Rutgers L. Rev. 415 [1968]); we only indicate that a State interest in what is, at the very least, from the moment of conception a living being and potential human life, is both valid and compelling.

## II

Appellant's second contention is that the Indiana Abortion Law is a denial of equal protection to the poor in that an abortion is available for the rich who can afford to obtain the abortion at some place where it is legal, such as New York, while a poor citizen has no means by which to obtain one. Since there has been no showing that the girl upon whom appellant performed the abortion was impoverished we have serious doubts that appellant has standing to assert this argument. See *State* v. *Clark* (1966), 247 Ind. 490, 217 N. E. 2d 587; *United States* v. *Raines, supra.* However, assuming she does have standing we find no merit in this contention. Were we to accept appellant's theory, then as soon as any location in the world allowed legalized abortion every state law contrary to it would be a denial of equal protection because the affluent person could fly there to obtain an abortion while the financially disadvantaged could not. The fallacy of the argument is readily apparent. Differences in laws of our various states are a part of our Federal system which emphasizes state self regulation and recognizes that the mores and morals of our citizens might differ in different regions of our nation. We must provide every citizen within our State equal protection under our own laws but we cannot provide every citizen in Indiana equal protection under New York law or the law of any other jurisdiction. There is nothing discriminatory on the face of the statute and there has been no showing whatsoever that the statute has been applied in a discriminatory manner. See *Steinberg* v. *Brown, supra; Rosen* v. *Louisiana State Board of Medical Examiners, supra.* See also *Sturgis* v. *Atty. Gen.* (1970), 358 Mass. 37, 260 N. E. 2d 687. Although sympathetic with the frequent difficulties faced by the poor and the inequities with which they are sometimes confronted, no denial of equal protection arises in any legal sense from the enforcement of this law.

## III

Appellant's last contention is that the statute is unconstitutionally vague; specifically, that the words "unless such miscarriage is necessary to preserve her life" cannot be interpreted with sufficient certainty to indicate what acts are or are not proscribed.

We first note that appellant is *not* a doctor and it was shown that the abortion was *not* performed with any intent to save the life of the mother. There can be no doubt that the act which appellant committed was in violation of the statute and that she was well aware of this fact. We therefore do not believe appellant is in a position to advance this argument. It was stated by Justice Clark in *United States* v. *National Dairy Corp.* (1963), 372 U.S. 29, 32-33:

> "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. [citations omitted] Indeed, we have consistently sought an interpretation which supports the constitutionality of legislation. [citations omitted].
>
> Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that *his* contemplated conduct is proscribed. [citation omitted]. In determining the sufficiency of the notice a *statute must of necessity be examined in the light of the conduct with which a defendant is charged."* (our emphasis)

See also, *State* v. *Clark, supra; United States* v. *Vuitch* (1971), 402 U.S. 62, 73 (White, concurring opinion); *United States* v. *Wurzbach* (1930), 280 U.S. 396. Since appellant was clearly in violation of the statute under any interpretation, it is not vague in relation to her conduct. If we are required to decide in this case whether, in some other theoretical situation, the statute might be overly ambiguous we are, in reality, dealing

with hypotheticals lacking in the concreteness necessary for a proper adjudication.

However, assuming *arguendo,* that appellant was in a position to assert this argument and realizing the importance of the question involved, we shall consider this assertion on its merits. The party questioning the constitutionality of a statute passed by the legislature must overcome a strong presumption favoring constitutionality. *Roeschlein* v. *Thomas* (1971), 273 N. E. 2d 554; *State* v. *Clark, supra; Hicks* v. *State* (1967), 249 Ind. 24, 230 N. E. 2d 757. Although a split of authority exists, similar statutes have been upheld against an attack of vagueness in several jurisdictions. See, *Rosen* v. *Louisiana State Board of Medical Examiners, supra; Steinberg* v. *Brown, supra; Babbitz* v. *McCann* (E. D. Wis., 1970), 310 F. Supp. 293 (held unconstitutional on other grounds) [app. dismd. 400 U.S. 1]; *State* v. *Abodeely* (Iowa, 1970), 179 N. W. 2d 347, app. dismd. and cert. den. 402 U.S. 936; *State* v. *Elliot* (1963), 234 Or. 522, 383 P. 2d 382.

This statute is not a recently enacted piece of legislation but has served the needs of this State for many years. In researching the law we have been unable to find any previous case which has challenged the constitutionality of this law. The people and the courts have apparently had no trouble in understanding its meaning.

The words, "unless . . . necessary to preserve her life" might present some difficulties if each word were to be defined separately without reference to the other words. This is the course which the California Supreme Court took in *People* v. *Belous* (1969), 71 Cal. 2d 954, 80 Cal. Rptr. 354, 458 P. 2d 194, cert. den. 397 U.S. 915. However, these words cannot be defined in a vacuum but must be read as a gestalt and in the context of the entire statute. Read in this manner the words have a clear meaning—an abortion will be allowed only when the continuation of the pregnancy will directly

and proximately result in the death of the mother. If this law appears too strict or harsh for some, the place to change it is not in the courts but in the legislature.

We do not deny that a doctor might in some case be faced with a difficult decision, however,

> "Wherever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so, it is familiar to the criminal law to make him take the risk." *United States* v. *Wurzbach, supra* at 399.

The burden remains on the State to prove that the abortion was not to save the life of the mother. See *United States* v. *Vuitch, supra.* We are of the opinion that the language of the statute is reasonably clear and gives fair warning as to its proscriptions. We therefore hold the abortion law is not unconstitutionally vague.

For all the foregoing reasons the judgment of the trial court is affirmed.

Judgment affirmed.

Arterburn, C.J., Givan and Prentice, JJ., concur; DeBruler, J., dissents with opinion.

### DISSENTING OPINION

DEBRULER, J.—There seems little point in writing in dissent to the decision of the majority on the standing issues presented by this appeal. The majority has decided to address itself to the merits of each of appellant's claims in support of her contention that the abortion statute is unconstitutional, and therefore, I will do so also.

I do not agree with the resolution made by the majority, of the appellant's claim that the abortion statute constitutes such an infringement upon the rights of women to privacy and to basic liberty, as to be in contravention of the due process of the Fourteenth Amendment to the United States

Constitution. I agree with the majority in its determinations that the statute is not void for vagueness under the Due Process Clause, and that it is not void as violative of the Equal Protection Clause. I would, however, re-emphasize the narrowness of the equal protection claim made here, and the inadequacy of the record in this case to support any such claim. The equal protection claim rests solely on the inability of a poor woman, because of a lack of money, to travel to another state or foreign country, to obtain an abortion while her wealthy counterpart is able to do so. The constitutional issues were raised by a one line motion to quash with short conclusory supporting memorandum attached. No evidence, statistical or otherwise, has been offered to buttress the argument. *Hardin* v. *State* (1970), 254 Ind. 56, 257 N. E. 2d 671.

The majority opinion focuses upon the nature of the interest of the State in protecting fetal life reflected in this statute. While it fully develops this interest of the State, it is deficient in describing the true nature and quality of the fundamental right to privacy and liberty which is here being asserted against this statute on behalf of pregnant women. A full consideration of what is at stake for the pregnant woman who is denied an abortion by this statute as well as a full consideration of the interest of the State in denying that abortion are necessary to a decision in this case. Both are necessary because we must decide not only that the State has a compelling interest in protecting fetal life, but we must also decide that the means chosen by the Legislature are both rational and necessary and that if those means infringe upon a fundamental constitutional right, we must determine whether alternative means exist which will equally serve that end and which are less destructive of the fundamental right. The proper view of our function in reviewing this claim made on behalf of pregnant women is stated in *Shelton* v. *Tucker* (1960), 364 U.S. 479, 81 S. Ct. 247, 5 L. Ed. 2d 231, as follows:

"In a series of decisions this Court has held that, even though the governmental purpose be legitimate and sub-

stantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purposes." 364 U.S. at 488.

See also *N.A.A.C.P.* v. *Alabama* (1958), 357 U.S. 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488.

That same view of the function of judicial review in sensitive areas involving fundamental rights was adopted by this Court in a right to privacy case in 1947, wherein this Court said:

"Granting that the citizen has . . . a right . . . to privacy and protection as guaranteed him by the constitutional provision quoted, these rights must be made to harmonize with the rights of the people collectively to life, liberty, safety and the pursuit of happiness likewise guaranteed by the constitution. *Between these rights there is sometimes an apparent conflict. It is the duty of government in so far as possible to avoid this conflict and to provide a way of life and safety that will protect both rights."* (Emphasis added.) *State ex rel. Mavity* v. *Tyndall* (1947), 225 Ind. 360, 364-365, 74 N. E. 2d 914.

See also *Board of Zoning Appeals* v. *Decatur, Indiana Co. of Jehovah's Witnesses* (1954), 233 Ind. 83, 117 N. E. 2d 115. This is the procedure which I would follow in deciding this case.

In my view of this case, the fundamental, personal right of privacy and basic liberty is here being asserted on behalf of pregnant women. It is contended that this right is being infringed by the abortion statute, and that this infringement denies to women that "liberty" protected by the Fourteenth Amendment, and that the statute consequently is unconstitutional. The Fourteenth Amendment provides:

"No state . . . shall deprive any person of life, liberty, or property, without due process of law."

This "liberty" protected by the Fourteenth Amendment has been held to be the same "liberty" given expression in the Preamble to the United States Constitution. *Jacobson* v. *Massachusetts* (1905), 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643. In that case "liberty," while susceptible of regulation by law, was considered to be "the greatest of all rights." A general description of, and attitude toward this right was put as follows in *Meyer* v. *Nebraska* (1923), 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 2d 1042:

> "Without doubt, it [liberty] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." 262 U.S. at 399.

Liberty is a basic civil right and is fundamental to the existence and survival of the race, and includes the right to marry and to procreate. *Skinner* v. *Oklahoma ex rel. Williamson* (1942), 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655. It includes the right to satisfy one's intellectual and emotional needs in the privacy of one's home. *Stanley* v. *Georgia* (1969), 394 U.S. 557, 89 S. Ct. 1243, 22 L. Ed. 2d 542. It partakes of the right to travel freely and without arbitrary governmental restriction. *U.S.* v. *Guest* (1966), 383 U.S. 745, 86 S. Ct. 1170, 16 L. Ed. 2d 239. It protects the right each of us has in the protection and maintenance of his health. *Kraus* v. *City of Cleveland* (1953), 55 Op. 6, 116 N. E. 2d 779. It even provides constitutional protection for such personal choices as the style of one's hair, whether to wear a beard or mustache. *Karr* v. *Schmidt* (1970), 320 F. Supp. 728.

The right to privacy and basic liberty has been given additional concreteness, most relevant here, in *Griswold* v. *Connecticut* (1965), 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510, and *Eisenstadt* v. *Baird* (1972), 405 U.S. 438, 92 S. Ct.

1029. Specifically involved in those cases was the right of persons to receive distribution of contraceptives. The right to obtain contraceptives carries with it the private right of the individual to decide when to use the devices, and when he shall forego using them, and this in turn gives rise to the private right to decide when an act of intercourse will be carried out for the purpose of satisfying one's own emotion and physical needs, and when it shall be done for the purpose of reproduction. The Court described the right there asserted in the following language:

> "If the right to privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (Emphasis added.)

These cases serve to identify the nature and perimeters of the right here pleaded on behalf of pregnant women, which right it is contended is infringed by the statute prohibiting abortions. It is obvious to me that the right to privacy and basic liberty is that enormous reservoir of freedom in which each of us daily maneuvers and makes choices, relatively free from governmental intrusion. Much of this freedom we take for granted. We have little reason to contemplate the periphery of this freedom. We have no need to invoke the protection of the Constitution in order to freely make routine daily decisions relating to such matters as eating, sleeping, buying, selling, saving, spending, going, coming, talking, breathing, walking, riding, looking, wearing, cooking, reading, working, playing, bearing and begetting. Surely no one would disagree with the conclusion that the basic liberty of a pregnant woman, that is, the reservoir of freedom in which to make choices, is substantially reduced by her pregnancy. For the sake of brevity, I call upon the reader to fairly contemplate the impact upon a woman and the family interests she represents, of a pregnancy, delivery, and receipt of a physically and legally dependent child. Cases of extreme hardship involving

real danger to the women's health, pregnancy by rape, and financial disaster, and many more come readily to mind. Suffice it to say that the stake of the pregnant woman in the abortion decision is great, as great as her life and health, and the health of her family.

I accept the description of the interest of the State in protecting fetal life made by the majority. This interest is great. The stake of the State is the stake that all of us has in the maintenance of a society in which human life is considered the greatest value and in which no man can grow so sick, so useless, or so evil that his life can be extinguished against his will. The State clearly has a legitimate and even compelling interest in legislating in the abortion area, and governing the abortion decision. However, the identification of this State interest and its characterization as compelling cannot serve as a basis of decision here.

By this statute, enacted in 1905, the State has declared its absolute indifference to the basic liberty of pregnant women. It prohibits all abortions, except in cases where death will certainly result to the pregnant woman if the abortion is not performed. And since the statute permits a legal abortion to be performed only where death is a certainty, a pregnant woman denied an abortion by this law, must run the risk of dying when that risk is not a certainty, but only a middle range probablity. Once pregnant, she is mandated in service of the State to hazard the risks of pregnancy and delivery, no matter what the degree of risk to her own health might be, and even though she may be involuntarily pregnant as the result of a rape. And after assigning her these burdens, this statute gives no form or degree of remedy or recognition to her person, her suffering, or any of her needs, be they physical, mental or even financial. It is this complete failure of the statute to minimize the violation of the woman's fundamental right that condemns this statute.

I would, therefore, hold in this case that this statute is

unconstitutional because it impermissibly and unduly invades and restricts women's right to privacy and basic liberty, guaranteed by the Due Process Clause of the Fourteenth Amendment.

NOTE.—Reported in 285 N. E. 2d 265.